# UNITED STATES DISTRICT COURT
## Eastern District of Wisconsin

TAVARIS HUNTER,

      Plaintiff,

  v.                                Case No. 25-cv-70

DEPARTMENT OF TRANSPORTATION (DOT),

      Defendant.

**COMPLAINT**

## I.    NATURE OF ACTION

101.    Tavaris Hunter brings this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq*., against the Wisconsin Department of Transportation Division of State Patrol, for a trial *de novo* in order to obtain damages and other appropriate relief for injuries arising out of employment discrimination and retaliation, pursuant to *University of Tennessee v. Elliot*, 478 U.S. 788, 106 S. Ct. 3220, 92 L. Ed. 2d 635 (1986), and *Buckhalter v. Pepsi-Cola Gen. Bottlers, Inc.*, 820 F.2d 892 (7th Cir. 1987).

1

## II.    JURISDICTION AND VENUE

### A.    Jurisdiction

201.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

### B.    Venue

202.  The Eastern District of Wisconsin is the proper venue for this action because the Plaintiff's claims arise within the geographical boundaries of the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III.    PARTIES

### A.    Plaintiff

301.    Plaintiff Tavaris Hunter is an adult resident of the State of Wisconsin and a Trooper for the Wisconsin Department of Transportation (DOT) Division of State Patrol (DSP).

### B.    Defendants

302.    Defendant DOT is an agency of and employer in the State of Wisconsin with the capacity to sue and be sued.

2

## IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401. Trooper Tavaris Hunter was hired in 2007 as a trooper for the Department of Transportation (DOT) Division of State Patrol (DSP), in the southeast (SE) Region, Waukesha Troop.

402. Hunter is African American with Black skin.

403. DOT employs approximately 400 state troopers and hundreds of unsworn employees in the DSP, and thousands of employees in total.

404. DOT-DSP's two top goals are enhancing public safety and combating crime and terrorism. (Tr. 36:4-37:11, Ex. 6, 7.) [1]

405. The State Patrol plays a vital role in criminal interdiction as Wisconsin's highways, such as those that run through Waukesha County, are a huge corridor for drug trafficking. (Tr. 812:9-813:2.)

406. Troopers are sent to training throughout their careers to be able to spot indicators of criminal activity. (Tr. 813:3-7.)

407. The Trooper position description provides that criminal enforcement is a major duty of a Trooper. (Tr. 32:4-33:17; Ex. 4.)

408. The State Patrol recognizes that "all illegal drugs and narcotics in this state are at one point or another transported by vehicle upon the highway" and that

---

[1] Citations following allegations in this Complaint refer to the ERD hearing transcript and exhibits, in *Tavaris Hunter v. State of Wisconsin Dept. of Transportation*, ERD #CR201901674 & CR202000683. This action seeks a *de novo* adjudication of Hunter's Title VII claims.

3

they are therefore tasked with locating, identifying, and apprehending those individuals. (Tr. 34:1-15, Ex. 5.)

409. Troopers are afforded a great deal of professional discretion in enforcing the laws, as is cemented in the trooper position description and the Wisconsin oath of officers.  (Tr. 398:6-400:7.)

410. By design, a trooper's work assignments are general in nature and modified by the employee to meet the circumstances presented.  (Tr. 399:10-15.)

411. As a trooper, Hunter consistently met expectations in every one of his quarterly and annual performance evaluations between 2007 and March 31, 2014.  (Ex. 1.)

412. Between 2007 and 2014, Hunter participated in various forms of criminal interdiction training through DOT and undertook criminal interdiction tasks on duty, and consistently received positive supervisory feedback for this activity. (Tr. 572:8-573:2.)

413. Supervisors, leading up to 2014, informed Hunter that while his enforcement of speeding and seatbelt violations were relatively  low compared to similarly situated troopers, he more than made up for this with his numerous skilled enforcement activities in criminal interdiction.  (Tr. 793:7-794:24; *see also* Ex. 8-10: performance reviews where Hunter's criminal interdiction work was praised by command staff, and supervisors made notations that Hunter's excellent criminal interdiction work balances out a lower number of speeding citations issued.)

4

414. For example, Hunter's performance review at Exhibit 8 provides:

Tavaris, you have demonstrated a passion for criminal interdiction and you have great skills and abilities in this type of enforcement. You have made many criminal arrests this past year, and you have removed many dangerous people from the highways

…

You have a unique ability to seek out and identify those motorists committing criminal acts. You use legal methods that you developed through training and experience to search vehicles for contraband. Your efforts have been very successful and have led to several felony drug and weapons arrests.

…

You have been very aggressive in highway criminal interdiction and you have made several high-profile felony level arrests.

…

You have developed skills to quickly identify those individuals who are being untruthful and you utilize legal methods to identify suspicious behavior.

(Tr. 47:20 - 50:4, Ex. 8; *see also* Tr. 55:9-21, Ex. 20 (supervisors welcoming opportunity for Hunter to take a lead role in the region to advance highway criminal interdiction).)

415. In and around 2014, Sgt. Guyton, an African American, was Hunter's direct supervisor.

416. Sgt. Guyton knew that Hunter has great cop instincts. (Tr. 416:17-20.)

417. Sgt. Guyton knew that Hunter wrote great police reports. (Tr. 416:21-23.)

418. Sgt. Guyton, when left to his own devices, delivered Hunter's performance review in early 2014, scoring Hunter as exceeding expectations in

5

communications and diversity, meeting expectations in all other areas, complimenting him on his diverse traffic enforcement, complimenting him on his excellent criminal interdiction skills, and encouraging him to apply for additional criminal assignments and training opportunities.  (Tr. 410:1-412:9.)

419.    However, Hunter did apply for criminal interdiction assignments around this time and did not receive them.  He believed he had been passed over in favor of less qualified white applications who received those positions. (Tr. 569:4-571:24.)

420.    In mid-2014, Hunter filed a race discrimination complaint questioning the motivation for the hiring for those positions, both internally with his employer, and with the Wisconsin Department of Workforce Development at ERD case number CR201402577.

421.    Hunter believed that Tim Carnahan (Caucasian) was the person responsible for placing the white applicants in the criminal interdiction positions rather than him, an African American, and Hunter believed that Carnahan was using an African American Supervisor, Sgt. Guyton, to funnel the discriminatory decisions so as to disguise them.

422.    Hunter identified in his workplace complaint that Tim Carnahan and Sgt. Guyton were the persons he believed was responsible for the discriminatory hiring. (Tr. 571:15-21.)

423.    Tim Carnahan was then the Captain/Regional Commander of the SE Region at the time; as Captain he served as supervisor of lieutenants; lieutenants

6

supervised sergeants, including Sgt. Guyton; sergeants supervised troops of approximately eight inspectors or troopers, like Hunter.

424. Tim Carnahan has since been promoted and is Superintendent of State Patrol.

425. In short, Carnahan subjected Hunter to a campaign of harassment and retaliation that lasted years, and consisted primarily of implementing unlawful and unfair quotas on Hunter, to reach a certain goal of speeding, seatbelt, and OWI citations, and denying Hunter credit for all the great achievements he accomplished in the arena of criminal interdiction – such as making arrests for unlawful guns and drugs being trafficked through the area.

426. The Wisconsin legislature, in its wisdom, has made it illegal to give quotas to law enforcement officers, illegal to require a certain number of traffic stops or citations per shift, and even illegal to tell a trooper a range of enforcement activity which management would find acceptable. (Tr. 401:6-402:3.)

427. Officially, the DOT-DSP does not support quotas, as the setting of any quota or requiring a specific number of citations or warnings diminishes officer discretion and the educational component of a trooper's role that contributes to highway safety and the reduction of traffic fatalities. (Tr. 402:5-14.)

428. It is a *typical* pattern for troopers who have heavy traffic enforcement numbers to have low criminal enforcement numbers, while those with heavy criminal

7

enforcement, who have a knack for getting guns and drugs off the highways and spend the necessary time to do this, tend to issue fewer speeding tickets. (Tr. 178:24-179:24.)

429. Hunter was the only trooper under Carnahan's supervision who had been known to have filed an ERD or EEOC complaint. (Tr. 71:7-10.)

430. Of his similarly situated peers, midnight troopers in the SE Region, Hunter was the only African American, and the only trooper to have asserted his rights not to be discriminated against in an ERD case. (Tr. 171:18-172:12.)

431. Carnahan knew about Hunter's ERD complaint in or around August 2014, when it was filed, and Carnahan sent an email referencing that complaint as early as September 2014. (Tr. 71:11-72:10.)

432. Around the time it was filed, Carnahan discussed Hunter's ERD complaint with HR, with the lieutenant, with Sgt. Guyton, and multiple times with DOT's Affirmative Action Officer Maya Rudd. (Tr. 72:17-73:3; 75:3-14.)

433. Sgt. Guyton and Captain Carnahan learned that Hunter's discrimination complaint was directed against them, personally, during these conversations. (Tr. 74:3-76:20, 79:6-15.)

434. Immediately after Hunter filed his discrimination case in the ERD, as early as September of 2014, Carnahan started collecting Hunter's enforcement data without involvement of Hunter's first line supervisor, Sgt. Guyton. (85:19-89:21; Exhibits 28-29.)

8

435. Carnahan expressed that he *hoped* that Hunter was not making traffic stops while unsupervised, such that it could be used against Hunter, in a September 2014 email. (85:19-89:21; Exhibits 28-29.)

436. Carnahan usurped some drafting responsibility for Hunter's next performance review in the spring of 2015 (Ex. 10), from Hunter's supervisor, Sgt. Guyton, and Hunter was issued the first "Needs Improvement" review he ever received. (Ex. 1; Tr. 494:10-495:2.)

437. It is very atypical for a Captain/Reginal Commander, to be drafting reprimands or reviews of a trooper – as this is the sergeant's job.

438. Lt. Clarke has testified:

Q. Is that typical for the sergeant to draft their own reprimands [for their troopers]?

A. Absolutely, yes.

Q. Is it typical for the sergeant to draft their own performance reviews?

A. Yes.

…

Q. Would that be typical for a captain to actually be drafting a trooper's performance review?

A. It would not be typical.

(Tr. 795:10-20, 803:5-7.)

439. Because it was so procedurally unusual for command staff at the Captain level to participate in drafting trooper performance reviews, Captain Carnahan would

9

later testify that he was involved in Hunter's review because Sgt. Guyton "struggled with writing," and "Sgt. Guyton, I'll be frank, was not a particularly good writer. And so I did review a lot of his work." (Tr. 691:3-5; 752:21-23.)

440. However, Carnahan did not draft the annual reviews of any other trooper on behalf of Sgt. Guyton, to accommodate Sgt. Guyton's alleged inability to write well. (754:2 "Q. Right. I'm asking what other troopers did you write for on behalf of Sgt. Guyton because Sgt. Guyton is such an allegedly poor writer. A. I don't remember exactly who they were.")

441. Moreover, even in the event that a sergeant needed assistance with a trooper's performance review, the lieutenant would have accommodated the sergeant's shortcomings, not the Captain/Regional Commander. (Tr. 103:9-104:7.)

442. In the performance review that immediately followed Hunter's ERD complaint, Hunter went from *exceeding expectations* in "communications" the year prior, to *not meeting expectations* in "communications."

443. At that time, no further negative employment action was or could be taken, because Carnahan knew that any termination for disciplinary reasons would require HR approval, and the seven just cause factors would have needed to be satisfied. (Tr. 96:15-97:7.)

10

444. However, Carnahan knew he could terminate a trooper under the "guise"[2] of "performance" through the use of Performance Improvement Plans (PIP). (Tr. 97:8-98:22.)

445. A trooper like Hunter cannot be placed on a PIP for performance unless he first received two unsatisfactory annual performance reviews. (Tr. 915:15-19.)

446. Before Carnahan could issue a second unsatisfactory annual performance review, the ERD, in mid-2015, found probable cause supported Hunter's race discrimination complaint (Ex. 1).

447. The DOT's own internal investigation, by Affirmative Action Officer Maya Rudd, determined that while she could not find evidence of a hostile work environment, "there were inconsistencies in 2014 which you may feel could support your allegations" as to the discriminatory hiring. (Tr. 569:4-571:19, Ex. 87.)

448. While Hunter's ERD case was certified for hearing and in the discovery phase, Carnahan temporarily backed off of his campaign of discrimination and retaliation until that ERD case was settled.

449. While the ERD action was in the discovery phase, Sgt. Guyton, alone, consistent with the regular business practice, completed Hunter's performance review in the spring of 2016.

---

[2] Carnahan used the word "guise" in his testimony. Moreover, it is accurate because it is unheard of for an experienced trooper, outside of the probationary period, to be terminated for "poor performance," or for any reason other than a work rule violation. (Tr. 300:1-301:2; 325:15-326:6.)

11

450. Again, Sgt. Guyton, when left to his own devices, gave Hunter a "meets expectations" in the Spring of 2016, because, even though some enforcement areas were low, all in all Hunter was a solid trooper. (Tr. 500:1-12.)

451. There was no lost-wages component to Hunter's first ERD complaint, and ultimately the discrimination complaint was resolved between the parties in mid-2016, for a bargained-for leave of absence in late-2016, that Carnahan was instructed to approve. (Tr. 79:16-25, 571:25-572:7; 763:3-764:9.)

452. At this point, Carnahan made Sgt. Guyton a figurehead with no decision making power, so that Carnahan could funnel discrimination and retaliation through Sgt. Guyton.

453. Hunter's very next review, in the spring of 2017 (Ex. 12), after the ERD case was dismissed pursuant to settlement, was the worst he had ever received. (Tr. 112:24-113:22, 503:3-22)

454. Again, like the negative review in the spring of 2015, Carnahan personally drafted the negative comments (Tr. 112:24-113:22, 503:3-22), whereas Sgt. Guyton documented the excellent police work Hunter had accomplished throughout the year, like saving a person from a burning vehicle and arresting two robbers who were wanted for a string of gas station robberies across the area. (Tr. 503:23-504:14.)

455. Carnahan, not Guyton, wrote negative comments about Hunter's "response to supervision." (Tr. 505:24-506:7.)

12

456.     This spring 2017 review also misleadingly compared Hunter's third-shift enforcement numbers to troopers working first and second shift, despite command staff knowing that is an unfair comparison due to significantly diminished traffic flow during the third shift. (*See e.g.* 120:22-121:2, 582:1-584:1, 634:19-634:6.)

457.     Though Hunter had received a positive performance review in 2016 while his ERD action was pending (Ex. 11), Hunter's March 2015 "needs improvement" review (Ex. 10), and his March 2017 "needs improvement" review (Ex. 12) were used as the two negative annual reviews required to place Hunter on a PIP.

458.     On April 1, 2017, at the very first opportunity, Carnahan placed Hunter on a PIP without HR's knowledge. (Tr. 118:16-120:1; Ex. 13.)

459.     In the regular course of business, Employee Relations/HR would be involved in the placement of a trooper on a PIP so as to help guide management through the process. (Tr. 929:15-25.)

460.     However, Hunter's supervisors did not inform ER/HR that Hunter was on a PIP until he had been on it for eight months. (Tr. 930:16-931:23, Ex. 112.)

461.     Carnahan's main instructions for Hunter's PIP, was that Hunter, despite his heavy interest and skill in criminal interdiction enforcement activities, needed to instead focus on increasing his enforcement (i.e. citations) in seatbelt, speed, and OWI offenses, to become a "well-rounded trooper."

462.     Trooper Henning was, around this time, a similarly situated white trooper who had high criminal enforcement activity and very low speed enforcement, and

13

Henning was not placed on a PIP so as to increase his traffic enforcement activities or become more "well-rounded." (*See e.g.* Tr. 179:1-25.)

463. Carnahan used the PIP to find and generate pretextual reasons for a discriminatory and retaliatory termination, by being overly intrusive, nitpicky, and giving competing directives that were impossible to comply with fully.

464. For example, Carnahan instructed Hunter he had to write more traffic tickets for the PIP, but also instructed Hunter to stay on the west side of the County, where there is less traffic and less opportunity for enforcement of traffic laws. (Tr. 137:12-138:4; 306:20-307:2 (Trooper Kneisler testifying the west side of the county is a "ghost town" over the midnight shift, and not where you would want to be if you were trying to increase traffic citations); 513:10-20 (Sgt. Guyton testified, "Q. Okay. And, for example, the overarching goal as we have covered was for Hunter to make more traffic stops throughout his shift, especially for speed, seatbelt, and OWI, right? A. Yes. Q. But he was also instructed to spend more time on the west side of the sector? A. Yes. Q. Which is like a ghost town in the middle of night? A. Yes.")

465. Hunter was held to a shorter timeline for completion of reports than any other trooper. (Tr. 517:10-518:3.)

466. As part of the PIP, Hunter was instructed to log his one hour round trip travel time to and from work[3] as "enforcement" time instead of "travel" time, yet also

---

[3] A trooper's shift starts and they begin enforcing traffic laws as soon as they pull out of their driveway, and continue as they travel to their department, sector, or other assigned work area. In

14

instructed not to make traffic stops except for serious offenses during this commute, which would manufacture misleading data – allowing Hunter only 7 hours of actual enforcement opportunity for every 8 hours logged. (Tr. 152:9-153:6, 514:23-516:9.)

467.    Hunter did as he was told, but also attempted to make a record of this unfair retaliatory practice, and accurately documented, "directed by management to use patrol code but not patrol;" which was an accurate statement DOT then used to support a false allegation that Hunter had a "bad attitude."  (Tr. 654:7-23.)

468.    Carnahan personally monitored the routes Hunter, and only Hunter, was taking to and from work, including noting at which gas stations he was choosing to buy fuel.  (Tr. 145:10-146:15.)  Lt. Clarke testified to how unusual this was – Hunter was the only trooper subject to this kind of monitoring.  (Tr. 811:11-812:5.)

469.    Carnahan personally, and through HR or IT staff, secretly monitored Hunter's computer to see if anything could be found that would constitute neglect of job duties (there was nothing concerning on Hunter's computer or email records).  (Tr. 142:11-145:9.)

470.    As part of the PIP, in May of 2017, Carnahan decided he would make Hunter keep his squad camera rolling throughout his entire shift beginning June 7, 2017 (this continued through his termination which would eventually occur on August 30, 2018).  (Tr. 126:10-14; 527:21-528:22)

---

fact, troopers can and do face discipline for failing to make traffic stops during their commute. (Tr. 146:17-147:15, 762:7-17.)

471. DOT had not ever subjected a trooper other than Hunter to constant squad camera monitoring, with the possible exception of a trooper that had received a plethora of citizen complaints, something Hunter had never received. (Tr. 138:5-139:13.)

472. Carnahan had Sgt. Guyton spend his work time watching Hunter's squad videos so as to know exactly what Hunter was doing at all times. (Tr. 528:14-529:17.)

473. In addition to 24/7 video monitoring, Carnahan instructed Hunter to fill out daily logs of his activities in 15-minute brackets throughout his shift. (Tr. 139:14-140:4.)

474. In May of 2017, Carnahan dictated that these logs only be completed in handwritten form, as opposed to electronically. (Tr. 140:5-21.)

475. Carnahan required Sgt. Guyton to require Hunter to submit daily handwritten logs, even though Guyton had a difficult time reading Hunter' s handwriting. (Tr. 468:4-22.)

476. A main theme of the PIP then became Trooper Hunter's handwriting being messy. (Tr. 525:5-7; 837:19-838:12.)

477. Handwriting is not even a duty of a trooper – it was a special requirement for Hunter and only Hunter, while on the PIP. (Tr. 640:25-641:2.)

478. Hunter repeatedly asked to be able to type the logs in response to complaints about his handwriting, but management would not allow it. (Tr. 527:14-20.)

479. Lt. Rembert testified:

16

Q. And there was previous testimony that in this hearing the only issue raised in this meeting and other meetings – other monthly meetings like it was illegible handwriting. Do you agree with that?

A. I do. I do agree with that. There were several times throughout the time period where the employee had to be counseled about his handwriting.

Q. But I'm going to ask you: Were there other issues brought up – other important issues brought up, or was handwriting the only issue?

A. Handwriting was one of the issues. Performance was another issue that was addressed during those meetings where the employee didn't have any activity or showed lack of activity or minimum activity where the employee was counseled about improving his performance. And that's pretty much what I can remember.

(Tr. 837:19-838:12.)

480. Messy handwriting is insufficient to reasonably motivate the discipline, let alone termination, of a veteran, decorated trooper, like Hunter.

481. Moreover, Sgt. Guyton admitted under oath that Hunter had improved his handwriting upon request, making the logs easier for Guyton to read, just as Hunter was asked to do. (Tr. 474:1-15.)

482. Despite being under very intense monitoring throughout the PIP period, Hunter had no work violations during this entire PIP and Final PIP leading to termination. (Tr. 154:3-11, 528:14-529:17.)

483. Sgt. Guyton testified:

Q. And Hunter was given the direction to record his entire shift when?

A.      June 7, 2017.

Q.      And that was through termination, right?

A.      Yes.

Q.      Okay. That's a long time.  And he was required to turn in these videos to you in addition to the logs, right?

A.      Yes, ma'am.

Q.      And the supervisors would be able to determine what he was writing in his log and how he was spending his time was 100 percent accurate, right, because you had those videos?

A.      Yes.

Q.      And you would review Hunter's dash cam of his shifts?

A.      Yes.

Q.      And between the log system and the constant video surveillance, you would know what Hunter was doing 100 percent of the time, right?

A.      Yes.

Q.      And that if there was something unaccounted for in the written log, you could look at the video, vice versa?

A.      Yes.

Q.      And during this entire time, entre PIP, FPIP, leading to termination, Hunter did not violate any work rules or policies, correct?

A.      Not that I am aware of.

(Tr. 528:14-529:17.)

18

484. Despite no work violations during the PIP period, Hunter was placed on a Final PIP.

485. The Employer's Employment Relations specialist, Annette Winkler, testified that after 15 years with Respondent, the only trooper to ever be placed on an FPIP is Hunter. (Tr. 903:22-904:19.)

486. Trooper Hanson was a white trooper also put on a PIP for poor performance, but he got off without being placed on an FPIP or terminated because he "responded by increasing his traffic enforcement across the board." (Tr. 630:1-13.) But *so did Hunter*, and yet, Hunter was terminated. (Tr. 635:23-636:6.)

487. Carnahan has been with Respondent for some four decades, and the only trooper under him to have ever been placed on a Final PIP is Hunter. (Tr. 131:24-122:8.)

488. In the Final PIP meeting of August 22, 2018, then Union President Glenn Jones informed Sgt. Guyton that he had never seen a program like Hunter's anywhere else in the State. (Tr. 482:9-14.)

489. Following a FPIP resulting in a supervisor's termination recommendation, by policy, an Administrative Review panel determines if the facts *as presented in the Administrative Review Summary packet* support termination, and if so, makes that recommendation to the administrator, who is the final authority. (Tr. 918:21-919:25.)

490. The Administrative Review panel consisted of decision-making personnel from the ranks of supervisors, including Carnahan, to HR, to the in-house attorney Dan Graff. (Tr. 187:17-189:1, Exhibit 50.)

19

491. The Employer primarily used "enforcement data" to support the decision to terminate Hunter. (Tr. 861:1-9.)

492. The data and information used to make a case for Hunter's termination was inaccurate and wildly misrepresented his true performance. (Tr. 664:20-665:12.)

493. Carnahan wrote in the Administrative Review that after Hunter was instructed to focus on seat belts, speed, and OWI's, "*he averaged less than one enforcement contact*" in each of these areas per shift, and that this was "low" for an experienced trooper. (Ex. 85, p. 5, emphasis by Carnahan.)

494. The statistics are continued, where Carnahan misleadingly portrayed Hunter as the lowest performing midnight-shift trooper in the southeast region. (Ex. 85, pp. 8-9.)

495. What the data *really* showed was that of SE Region third-shift troopers, Hunter was a middle performing trooper in some enforcement areas, a high performing trooper in some enforcement areas, and the lowest performing trooper in *no* enforcement areas.

496. Exhibit 47, depicted where relevant below, consists of accurate graphs based on the employer's enforcement data, and gives a good idea of the types of enforcement activities a trooper has engaged in compared to his similarly-situated peers working in the SE region on the overnight shift. (Tr. 174:10-20; 177:13-18.)

497. Hunter was the second highest in OWI enforcement, with only one other trooper making more OWI arrests on a per-shift basis than Hunter during the FPIP

20

period:

| | Shifts | OWI | OWIs p/s |
|---|---|---|---|
| Her | 56 | 14 | 0.25 |
| Hunter | 86 | 19 | 0.22 |
| Henning | 99 | 20 | 0.2 |
| Kneisler | 111 | 20 | 0.18 |
| Thompson | 107 | 18 | 0.17 |
| Darin | 108 | 13 | 0.12 |
| Magnussor | 109 | 9 | 0.08 |
| Morales | 83 | 6 | 0.07 |
| Mittelstadt | 89 | 5 | 0.06 |
| Moore | 113 | 5 | 0.04 |



OWIs Per Shift Feb 28 - Aug 28, 2018

(Ex. 47, Tr. 174:10-177:10.)

498. Hunter was also the second highest in criminal enforcement during the FPIP period:

21

|  | Shifts | Criminal | Criminal p/s |
|---|---|---|---|
| Henning | 99 | 66 | 0.67 |
| Hunter | 86 | 50 | 0.58 |
| Morales | 83 | 33 | 0.4 |
| Moore | 113 | 44 | 0.39 |
| Her | 56 | 20 | 0.36 |
| Magnussor | 109 | 38 | 0.35 |
| Kneisler | 111 | 30 | 0.27 |
| Thompson | 107 | 25 | 0.23 |
| Mittelstadt | 89 | 16 | 0.18 |
| Darin | 108 | 16 | 0.15 |



(Ex. 47, Tr. 174:10-177:10.)

499. The Administrative packet, as pretextual support for Hunter's termination, reported that the other midnight shift troopers had 1.65 to 5.76 times Hunter's 2.41 traffic stops per shift.

22

500. No trooper had anywhere near 5.76 times the number of Hunter's traffic stops per shift.

501. Carnahan reported, as pretextual support for Hunter's termination, that the other midnight shift troopers had 1.22 to 5.2 times Hunter's .172 p/s seatbelt enforcements per shift.

502. Actually, Hunter, during the FPIP period, was the at middle of the troop in seatbelt enforcements, writing more citations than 4 and fewer than 5 of his peers:

| Kneisler | 111 | 80 | 0.72 |
| Morales | 83 | 57 | 0.69 |
| Henning | 99 | 68 | 0.69 |
| Mittelstadt | 89 | 47 | 0.53 |
| Thompson | 107 | 33 | 0.31 |
| Hunter | 86 | 16 | 0.19 |
| Magnussor | 109 | 19 | 0.17 |
| Darin | 108 | 15 | 0.14 |
| Moore | 113 | 14 | 0.11 |
| Her | 56 | 3 | 0.05 |



(Ex. 47, Tr. 174:10-177:10.)

503. Carnahan reported, as pretextual support for Hunter's termination, that the other midnight shift troopers had 2.04 to 9.26 times Hunter's .689 speed enforcements per shift.

504. Again, the real data showed Hunter was in the middle of the pack for speeding citations, with about half the similarly situated troopers issuing more and half less:



| | Shifts | Speed | Unreas/Imp | Total Speed | Select Speed p/s | All Speed p/s |
|---|---|---|---|---|---|---|
| Her | 56 | 18 | 0 | 18 | 0.32 | 0.32 |
| Henning | 99 | 52 | 2 | 54 | 0.53 | 0.55 |
| Darin | 108 | 118 | 1 | 119 | 1.09 | 1.1 |
| Kneisler | 111 | 129 | 1 | 130 | 1.16 | 1.17 |
| Hunter | 86 | 64 | 43 | 107 | 0.74 | 1.24 |
| Magnussor | 109 | 218 | 1 | 219 | 2 | 2 |
| Thompson | 107 | 210 | 8 | 218 | 1.96 | 2.04 |
| Morales | 83 | 249 | 0 | 249 | 2.6 | 2.6 |
| Moore | 113 | 395 | 0 | 395 | 3.5 | 3.5 |
| Mittelstadt | 89 | 138 | 2 | 140 | 49 | 51 |

(Tr. 178:15-23, Ex. 46-47.)

505. Adding all of the citations and warnings together, to get a broad view of enforcement activity, there were three SE midnight troopers writing more citations and warnings than Hunter, and six writing fewer - again, Hunter was above the middle of the pack:

24

| | Shifts | Cites/Warns | Citations and warnings p/s |
|---|---|---|---|
| Kneisler | 111 | 1321 | 11.9 |
| Morales | 83 | 810 | 9.76 |
| Magnussor | 109 | 1029 | 9.44 |
| Hunter | 86 | 765 | 8.9 |
| Moore | 113 | 804 | 7.12 |
| Thompson | 107 | 747 | 6.99 |
| Henning | 99 | 634 | 6.4 |
| Mittelstadt | 89 | 413 | 4.64 |
| Darin | 108 | 459 | 4.25 |
| Her | 56 | 128 | 2.29 |



(Tr. 180:5-16.)

506.    Hunter was a well-rounded, middle-to-top of the pack trooper as shown by the FPIP data, and yet was terminated anyway. (Exhibits 46-47.)

25

507. None of SE midnight troopers writing fewer citations than Hunter were placed on a PIP to increase their enforcement activity, let alone terminated.

508. Similarly, termination documentation represents that Hunter made "no substantive changes to his work performance" despite the PIP and FPIP, to support the false assertion that Hunter is "capable of achieving the employer's reasonable goals and performance expectations. *He just refuses to.*" (Ex. 85, p. 19.)

509. The truth was, Hunter steadily increased his enforcement just as requested between 2016 and 2018. (Tr. 532:12-24; 533:6-25.)

510. The following graph depicts Hunter's increases in each category, on the left, as well as traffic stops across the board no matter the reason, on the right, between being placed on the PIP and being terminated:



| Year | Hrs Worked | Traffic Stop | Speed Enf | Seatbelt | OWIs | Criminal arrests | Year | Traffic stops p/h | Speed Enf p/h | Seatbelt p/h | OWIs p/h | Criminals p/h |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 1720 | 248 | 38 | 18 | 11 | 43 | 2016 | 0.144 | 0.022 | 0.01 | 0.006 | 0.025 |
| 2017 | 1531.7 | 299 | 71 | 23 | 13 | 63 | 2017 | 0.195 | 0.046 | 0.015 | 0.008 | 0.041 |
| 2018 | 1141.5 | 319 | 87 | 22 | 15 | 60 | 2018 | 0.279 | 0.076 | 0.019 | 0.013 | 0.053 |

26

(Ex. 48.)

511. Lt. Rembert testified that Hunter was solely terminated for "performance"- not meeting his PIP goals of increasing enforcement in speeding, seatbelts, and OWI (861:1-9), and then proceeded to summarize Hunter's paradoxical situation succinctly:

> Q. And do you see that despite working fewer hours every year, he has increased his traffic stops every year, like he was directed to on this performance improvement program?
>
> A. I see that.
>
> Q. And that he has increased his speeding enforcement every year despite having fewer hours on duty to complete those enforcement actions? Do you see that?
>
> A. I see that.
>
> Q. And he's got more – he's increased across the board, right? He's increased his seat belt citations, he's increased his OWI citations, and he's almost even increased all of his criminal arrests, as well, right?
>
> A. Correct.
>
> Q. And he's increased his traffic stops between 2016 and 2018 like he was instructed to do, right?
>
> A. Correct.
>
> Q. If you had been presented this data that we see in Exhibit 49 at the termination hearing for Hunter, would you still have voted to terminate him?
>
> A. I would have, yes.

27

Q. Even though he's increasing across the board in every area that he was instructed to?

A. Yes.

(Tr. 886:15-887:15.)

512. While the doctored data was the primary tool used to unlawfully terminate Hunter, the Employer added additional pretextual reasons to the termination packet, that are just as verifiably false as the doctored data.

513. For example, the Administrative Review Summary contained pretextual allegations that Hunter was insubordinate and dismissive of supervision throughout his FPIP period, (Ex. 85, p. 10), but the audio recordings of the FPIP conflict with the written accusations.

514. The Administrative Review Summary states that Hunter abused his discretion by giving a warning rather than a citation to someone going 25 miles over in a construction zone, and then was dismissive of his supervisor's concerns. (Ex. 85, p. 6.) But, the actual audio recording of this conversation proves that Hunter's discretion was reasonable, calmly explained, and depicts nothing that could be fairly categorized as dismissive. (Tr. 953:11-955:10.)

515. Similarly, the Administrative Review alleges that Hunter "became defensive" when supervision tried to address an "unsafe" search of a vehicle without a backup officer present. (Ex. 85, p. 16.) Again, the audio recording of this conversation is

28

quite the opposite, with Lieutenant Rembert telling Hunter he did not do anything wrong on that search, period.  (Tr. 860:23-866:12.)

516.    The supervisors allowed the HR team to believe inaccurate data they had written down, despite being present for the FPIP meetings and knowing the truth (as recorded).  Lt. Rembert has testified:

> Q.    Did you voice up during that meeting like, "I'm concerned about this document that we're relying on, this is not a good reason to terminate someone, I actually told him he didn't do anything wrong, and his attitude was pretty good"?
>
> A.    I did not.
>
> Q.    Why not?
>
> A.    Because my vote was based on the overall performance of that time period, the final performance improvement plan.
>
> Q.    Not so much asking about your vote, but you knew there were people from HR voting; right?
>
> A.    That's correct.
>
> Q.    And those people from HR are not familiar with Trooper Hunter on an individual level at all and probably don't even know what it takes to be a trooper, if we're being honest, right?
>
> A.    Correct.
>
> Q.    And you knew that they were going to be relying on the words in this document for their vote; right?
>
> A.    That's correct.

(Tr. 867:20-868:19.)

29

517. The Administrative Review alleged that Hunter was consistently not enforcing during the last two hours of his shift as command staff requested. (Ex. 85, p. 9; Ex. 85, p. 9.) However, the audio recording of the May 2018 FPIP meeting depicts Sgt. Guyton informing Hunter that Hunter was making stops in the last two hours of his shift as requested, and Hunter was doing well and headed in the right direction. (Tr. 474:1-15.)

518. Similarly, the write-up of the April, 2018, meeting notes portrayed that Sgt. Guyton had a problem with how long Hunter was taking to write a police report, but the actual recording of that meeting depicts Sgt. Guyton telling Hunter, "I don't have an issue with his report writing. He writes a very well-written report. It takes time. I give him credit." (Tr. 467:8-25.)

519. In the audio recording of the June, 2018, FPIP meeting, Sgt. Guyton informed Hunter that he was progressing in the right direction and staying active out there, yet the written June 2018 FPIP notes state: "Hunter is not giving the performance program an opportunity to work." (Tr. 479:5-21.)

520. As another pretextual excuse to terminate Hunter, DOT falsely alleged that Hunter's practice of reviewing his videos while writing reports was inappropriate and a waste of time, despite that his reports were concededly well written and professional. (Ex. 85, p. 7, 582:3-583:13.)

30

521.     However, not only is reviewing video while writing a report best practice[4] (*see e.g.* Tr. 299:2-25), it has actually been a required practice pursuant to policy of DOT since January of 2018, eight months prior to Hunter's termination. (421:19-423:3, Ex. 63, p. 7, 5(A)(3)(d).)

522.     Hunter was also nitpicked for things that were not within his control.  For example, the employer criticized Hunter in his termination packet for being "unprofessional" for having scuffs in his leather belt and a corroded badge. (Tr. 456:7-24.)

523.     Sgt. Guyton had been instructed by Carnahan to write that Hunter was "unprofessional" for having scuffs in his leather belt and a corroded badge. (Tr. 456:7-24.)

524.     However, it was not Hunter's responsibility to supply himself with these items; DSP provides the duty belt and badges to troopers. (Tr. 456:20-457:20, 529:10-23.) Instead of writing Hunter up for his badge and belt showing his decade of service, DSP could have, but did not, simply replace these items.  (Tr. 456:20-457:20, 529:10-23.)

525.     During the PIP and Final PIP process, Hunter would complain that his enforcement numbers were being misrepresented, he was being treated unfairly, and it was due to discrimination and retaliation by his command staff.

---

[4] Ironically, these same supervisors instructed Sgt. Guyton during Hunter's PIP and FPIP to use his recordings from those meetings to add information to his monthly reviews about Hunter, implicitly recognizing that this is an acceptable practice and the best way to get a thorough and accurate report.  (Tr. 423:4-10; Ex. 64.)

31

526. Sgt. Guyton testified that Hunter would say to him, in a calm and respectful manner, throughout the PIP, things to the effect of – "we all know what this is, we will just go through the motions, and we all know this is ending in me getting terminated because every time I get more numbers, it's just never enough." (Tr. 656:23-5.)

527. Hunter would write on the PIP forms that he felt that retaliation and discrimination from command staff was a barrier to him meeting his goals. (Tr. 657:6-15.)

528. Carnahan considered Hunter's complaints of discrimination and retaliation to constitute "insubordination." (Tr. 165:2-8.)

529. In fact, the employer's Administrative Review Summary, containing the reasons Hunter should be terminated, included that Hunter believed he had "retaliatory/discriminatory command staff." (Ex. 85, p. 10.)

530. Lt. Rembert has testified:

> Q. So is it that Hunter was alleging retaliatory and discriminatory actions by command staff, and then you decided, well, he's lying, so I'm not going to send it to HR or any proper channels to be investigated?
>
> A. That would be correct because – I was personally there. I didn't see any of that.
>
> Q. And is that your understanding of what the Department of Transportation normal business procedure is, if an employee claims that they're fearing retaliation and discrimination, the supervisor can just say, "Huh, I don't believe it" and not pass it up for review?

32

A.      No, no, that's not normal practice.

(Tr. 879:3-16.)

531.    HR, through its Employee Relations Specialist, Ms. Winkler, testified that during the FPIP process, Hunter claimed he was experiencing retaliation and discrimination, and the employer "looked into it, and [Hunter] had never made a case as to why it was discriminatory. But from all things that I saw, nothing was discriminatory from what we were doing." (Tr. 894:13-20.)

532.    On cross-examination however, Ms. Winkler testified:

Q.      I want you to try to listen very carefully to my question and answer the question that I'm asking. Did you look into Hunter's written allegation that his command staff was retaliating against him; yes or no?

A.      Yes.

…

Q.      Are you testifying that you believe you asked [the command staff involved] what could a potential basis for retaliation be?

A.      Correct.

Q.      And neither of them told you, well, there was a discrimination complaint that Hunter lodged against us and we were all interviewed in 2015 about that?

A.      I don't recall that coming up.

Q.      Is that something you would expect them to disclose to you if you asked them in your formal capacity?

A.      Yeah.

Q.      Yes?

33

A. Yeah.

Q. So when you asked command staff that was involved with the FPIP what could possibly he be talking about that we're retailing against him for, when they said, "we can't think of anything," did that sort of end your investigation there?

A. Yea, pretty much. I mean, there was nothing else I could go off of.

…

Q. So did you alert AAEEO and/or Brenda Brewer that, "Hey, one of…the troopers in the Division of State Patrol is making an allegation of retaliation"?

A. Normally I would, but I don't know if I did in this case. I don't remember. I'm not saying I didn't. I just don't recall.

(Tr. 907:21-909:13, 910:12-911:6.)

533. The employer could have, but did not, obtain a statement from Hunter regarding his claims of discrimination and retaliation regarding the FPIP. (Tr. 909:13-23.)

534. Instead, the employer allowed Carnahan to carefully funnel his discrimination and retaliation through a Black supervisor, Sgt. Guyton, while also denying Sgt. Guyton use of his own professional discretion.

535. As early of May of 2017, Guyton would simply cut and paste Carnahan's words and send them to Hunter, as if the words were coming from Guyton. (Tr. 493:15-494:6.)

536. Sgt. Guyton has testified:

34

Q. You were asked [by DOT] about R27, which is Exhibit 78 [letter of expectation], and you were asked who signed it and you said Guyton did, I did, right?

A. Yes.

Q. Who wrote it?

A. I'm not sure.

Q. Did you write it?

A. No.

Q. No. And R20 is Exhibit 79 [letter placing Hunter on FPIP]?

A. R20?

Q. Yes.

A. Yes.

Q. Your attorney asked you who signed it and of course we can see you signed it, right?

A. Correct. Yes.

Q. Who wrote it?

A. I'm not sure.

Q. Not you?

A. Not me.

(Tr. 655:25-656:18.)

537. Carnahan testified at the arbitration hearing (and his deposition) that he had no part in collecting the "data" used to support Hunter's

35

negative reviews and termination, and he claimed this was done by Sgt. Guyton. (Tr. 80:6-82:18.)

538. Sgt. Guyton has testified:

> Q. So I want to draw your attention to this sentence right below these bullet points-
>
> A. Okay.
>
> Q. - that's in bold and italics, right?
>
> A. Uh-huh.
>
> Q. And it says, "This means that with regard to speed and restraint enforcement action, he averaged less than one enforcement contact in either category per shift, right?
>
> A. Yes.
>
> Q. And that, if you are presenting it to a bunch of HR staff that don't know jack about being a trooper, that might seem kind of shocking, right?
>
> A. That's possible.
> …
>
> Q. Okay. In reality, every single one of your southeast troopers working the midnight shift is averaging less than .25 OWIs per shift, right?
>
> A. Okay.
>
> Q. Every single one?
>
> A. Yes.
>
> Q. And every single one of your southeast troopers is averaging less than .72 - .72 or less enforcement actions in seat belts per shift, right?

36

A.    Yes.

Q.    …All right. Speed per shift…You have three troopers that are getting between one and two speeds per shift?

A.    Okay.

Q.    Right? But every – all of the other ones are getting fewer, right?

A.    Yes.

Q.    So these numbers are just, like, normal and average, right?

A.    Compared to that, yes.

Q.    Yeah.  Did you – I want to draw your attention to Page 8 where this says traffic stops during the FPIP, Trooper Hunter made an average of 2.41 traffic stops per shift…Other troopers had between 1.65 and 5.76 times the number of stops as did Trooper Hunter, right?

A.    Yes.

Q.    Did you write that?

A.    No.

Q.    No. Did you write this one about speed enforcement that has the same kind of analysis?

A.    No.

Q.    Did you write this one about the restraint enforcement at the bottom of Page 8 with the same kind of analysis?

A.    No.
      …

37

Q. If you had realized that these numbers were wildly misrepresented, would you have talked to supervision about that?

A. Yes.

Q. And would you have talked to HR about that?

A. Yes.

(Tr. 661:17-664:19; 665:15-21.)

539. Perhaps most blatantly – Carnahan denied Sgt. Guyton a vote as to whether Guyton's direct report – Trooper Hunter – should be terminated.

540. It is typical for a first line supervisor to have input into whether a trooper should be terminated, and White supervisors are routinely given a vote as to whether a direct subordinate should be terminated. (Tr. 869:2-14, 917:18-22.)

541. Sgt. Guyton was part of, and attended the Administrative Review, where the termination decision was made, but he testified that he was made to understand the decision was not his, and DOT-DSP did not even offer Sgt. Guyton a vote. (Tr. 566:21-567:10.)

542. Sgt. Guyton knew that Hunter was doing what was asked and improving in the areas requested while on the program. (Tr. 473:21-24.)

543. However, Sgt. Guyton was *not* a decisionmaker in Hunter's termination, and rather, Guyton testified, it was up to Carnahan, as well as maybe the lieutenant, and the "upper echelon of the State Patrol." (Tr. 564:5-21.)

38

544. Sgt. Guyton did not believe that Hunter should be terminated, but he was "not at the table saying yea, nay, or, you know. I am not the one in charge of making these decisions…I didn't have any part in that. That's upper management." (Tr. 568:1-7.)

545. Immediately after Hunter was terminated in August 2018, Sgt. Guyton was transferred to the Dignitary Protection Unit, where he no longer has the responsibility of supervising subordinates. (Tr. 25:10-17, 395:16-396:12.)

546. Meanwhile, Hunter appealed his August 2018 termination with his union attorney, and an Arbitrator, after a hearing, ultimately held that Mr. Hunter's termination was not for just cause, and reinstated Mr. Hunter to his trooper position. (Ex. 90, p. 25.)

547. However, the Employer significantly mislead the Arbitrator during the hearing, and continued offering its pretextual reasons for termination, which it was able to do because the Arbitrator was denied the underlying evidence of (a) enforcement data, and (b) the audio-recordings of the FPIP meetings.

548. Instead of the audio-recordings of the FPIP meetings, the Arbitrator was only provided the misleading write-ups of those FPIP meetings, which were inconsistent with the recordings, as chronicled above.

549. The underlying enforcement data was not made available at the time of the arbitration hearing, though of course Respondent had it (and later had to produce it in discovery in this case before the Equal Rights Division). (Tr. 532:25-533:8, 578:3-20.)

39

550.    The Arbitrator wrote that the union objected: "to the fact that the Employer only produced the summary of the data relied upon for its comparisons and not the raw data itself.  That's true, ***but in the opinion of the Arbitrator the data was kept in regular course of business and reliable.***  However, having said that, the Arbitrator agrees with the Association that the data should have been produced at the hearing for cross-examination."  (Ex. 90, p. 20) (emphasis added).

551.    The Arbitrator's assumption that the summaries of data provided by DOT were reliable, without the proof in the form of the underlying raw data, was grave error, as chronicled above.

552.    Carnahan had testified at the Arbitration hearing that his "assumption" was that many of Hunter's numbers were the lowest of the midnight troopers in the SE region, when the truth is, the raw data established that in *no category* was Hunter the lowest.  (Tr. 184:3-185:7.)

553.    Carnahan also testified at the arbitration hearing to the effect that Hunter had never informed management that the numbers they were generating for Hunter's enforcement during the FPIP meeting seemed to be incorrect.  (Tr. 185:8-186:16.)

554.    However, Carnahan knew that Hunter had reported that managements' data seemed inaccurate based on the tickets he knew he was writing in the field.  (Tr. 186:17-187:8; Exhibit 49.)

555. Carnahan testified at the arbitration hearing that even if Hunter had 103 speed enforcements, this number was still poor compared to other midnight shifter in the troop – Trooper Kneisler. (Tr. 169:5-169:23.)

556. But the truth is, 103 speed citations was *greater* than the number of speed citations Kneisler issued over that same time period. (Tr. 170:7-12.)

557. Similarly, DOT presented testimony to the Arbitrator that Hunter had been warned to take more direct routes to work, and Hunter "disregard[ed] the warnings." (Ex. 9, p. 20.) However, the audio recording of the May 2018 FPIP meeting depicts Sgt. Guyton telling Hunter that this problem has been resolved because Hunter has improved as requested and getting to his sector directly was no longer a problem. (Tr. 477:3-11, 478:14-25.)

558. Additionally, Carnahan testified at that Arbitration hearing that one of Hunter's performance problems was that the District Attorney had sent emails to Carnahan personally, complaining that Hunter was not getting reports, citations, and evidence submitted in a timely manner. This was, as the DOT later stipulated, untrue. (Tr. 158:6-160:17.)

559. At the arbitration hearing, DOT argued that Carnahan and Guyton were unaware of Hunter's ERD activity and therefore could not possibly have been acting in retaliation for the same. (Tr. 538:1-20, Dkt. 90, p. 9: "Appellant argues that Mr. Hunter's placement on his Final Performance Improvement Plan and his ultimate termination were a result of retaliation for a discrimination complaint that was filed. This is

41

unfounded. **The Sergeant and other management testified credibly that they had no knowledge of this discrimination complaint and one cannot retaliate against someone when they have no knowledge of the complaint**." (emphasis added.))

560. However, as chronicled in specific allegations, above, both Sgt. Guyton and Captain Carnahan were *well aware* of Hunter's protected activity since 2014.

561. Sgt. Guyton had testified under oath before the Arbitrator:

Q. Are you aware that Mr. Hunter filed an ERD complaint in 2014?

A. It's possible.

Q. Well, are you aware of it? Have you heard of that?

A. Not really. Not in 2014, no.

Q. Well, you're aware that you were the subject of the complaint, correct?

A. I am kind of – No. I am not really sure what you're talking about to be honest with you.
….

Q. So at no time you knew - you didn't know a complaint was filed against you?

A. No, sir.

(Tr. 535:12-537:12, *citing to* arbitration transcript page 133, line 2, and page 178, line 16.)

562. Subsequently, at the ERD hearing, Sgt. Guyton admitted that he was aware of the ERD complaint and *had been formally interviewed about Hunter's allegations* at least twice (on 11/11/14 and 6/16/15) prior to the Arbitration hearing. (Tr. 534:22-535:11;538:21-539:2.)

42

563. Based on the misleading data presented at the Arbitration hearing, the Arbitrator had been led to believe that the Hunter "was resisting nearly every aspect of the FPIP process and has made no consistent and substantive changes to his work performance." (Dkt. 90, p. 6.)

564. The true data, hidden from the Arbitrator, showed that Hunter *increased his material metrics across the board*, during the PIP period from 2016 to 2018, as graphed above.

565. Because the Arbitrator had been misled, Hunter received only ½ back pay for the period of the unlawful termination at the time the Arbitrator reinstated Hunter to his position.

566. Hunter also filed an ERD complaint regarding the discriminatory and retaliatory termination of August 2018, Case No. CR201901674, which was pending at the time Hunter was reinstated to his trooper position by the Arbitrator.

567. Shortly after Hunter returned to work as reinstated by the Arbitrator, in approximately February of 2020, he suffered further retaliation when he was denied a reasonable accommodation for his Pseudofolliculitis Barbae (PFB), a painful and unsightly condition affecting almost exclusively men of color, when Hunter was ordered to maintain a clean-shaven face contrary to medical orders.

568. Hunter filed ERD Case No. CR20200068 to report that discriminatory and retaliatory refusal to accommodate.

43

569. In a February 19, 2024, decision of the Equal Rights Division, the ERD found that after Hunter was reinstated, post-termination, while his ERD complaint was pending, the Employer did unreasonably fail to accommodate Hunter's PFB.

570. However, the ERD did not find discrimination or retaliation. It erred in this respect.

571. The ERD is an administrative agency, and no Court has made findings of fact or conclusions of law in this case.

572. Therefore, Hunter is entitled to a *de novo* adjudication of his federal civil rights claims in Federal Court, and he received his right to sue letter fewer than 90 days ago, on October 31, 2024.

## V. VIOLATIONS OF LAW

**Title VII of the Civil Rights Act of 1964: 42 U.S.C. § 2000e-5, et seq.**

601. By discharging Trooper Hunter from employment based on his race, the Defendant violated Hunter's right to be free from discrimination, as guaranteed under Title VII of the Civil Rights Act of 1964.

602. By discharging Trooper Hunter from employment in retaliation for complaining about discrimination and filing a discrimination charge with the Wisconsin Equal Rights Division and the EEOC, the Defendant violated Hunter's right to be free from retaliation, as guaranteed under Title VII of the Civil Rights Act of 1964.

44

## VI.    RELIEF

## A.    DAMAGES

701.    By virtue of unlawful actions alleged above, Trooper Hunter sustained economic losses and expenditures, loss of income including back pay and loss of future earning capacity, professional humiliation, harm to business and reputation, and other damages for which he should be compensated in an amount deemed just by the Court.

## VII.    CONDITIONS PRECEDENT

801.    All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII.    DEMAND FOR JURY TRIAL

901.    The Plaintiffs hereby demand a trial by jury of all issues triable of right to a jury.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Hunter prays that the Court grant judgment against the Defendants, awarding the Plaintiffs:

1001.   Monetary damages in amounts that will fairly compensate the plaintiff for his injuries, including but not limited to equitable relief in the form of back pay in the

amount of $37,989.29, and except for any amounts it withholds to pay to the Unemployment Compensation Reserve Fund, plus interest, compensatory damages in the amount of $300,000, as well as an amount fair for lost future earnings;

1002.   The costs, attorneys' fees and litigation expenses as well as any further relief this Court deems just.

Respectfully submitted this January 14, 2025.

Trooper Tavaris Hunter,

PLAINTIFF,

By

THE JEFF SCOTT OLSON LAW FIRM, S. C.
Jeff Scott Olson
Wis. Bar. No. 1016284
Andrea J. Farrell
Wis. Bar. No. 1064773
1025 Quinn Dr., Suite 500
Waunakee, WI 53597
Phone          608 283 6001
Fax            608 283 0945
E-mail         jsolson@scofflaw.com
               ajf@scofflaw.com


/s/ Jeff Scott Olson
/s/ Andrea J. Farrell

_____

Jeff Scott Olson
Andrea J. Farrell
Attorneys for Complainant