# In the
# United States District Court
## For the
## Eastern District of Wisconsin

TAVARIS HUNTER,

      Plaintiff,

    v.

WISCONSIN DEPARTMENT OF
TRANSPORTATION,

      Defendant.

Case No. 2025CV00070

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
FOR AN EXTENSION OF THE SCHEDULING ORDER**
*Declaration of Andrea J. Farrell filed herewith*

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
Andrea J. Farrell
State Bar Number 1016284
1025 Quinn Dr., Suite 500
Waunakee, WI 53597-2502
Phone     608/283-6001
Fax      608/283-0945
Email:   [ajf@scofflaw.com](mailto:ajf@scofflaw.com)

# Table of Contents

I.    Introduction ..................................................................................................... 1

II.    Defendant's motion is brought under the wrong rule, FRCP 6(b), as FRCP 16(b)(4) controls modification of a scheduling order – though both require Defendant to make a showing of "good cause." ................................................................... 2

III.    Defendant has wholly failed to show "good cause" to extend discovery by even one day for the purpose of maybe taking Plaintiff's deposition – Defendant has never sought Plaintiff's deposition in the nine month's the Court provided for discovery. ............................................................................................................ 3

IV.    Defendants failed to show "good cause" to extend the summary judgment deadline by 60 days, though Plaintiff would not be opposed to a *short* extension of the deadline to accommodate Defense Counsel's trial schedule in *Mahmoud v. Board of Regents*, if Defendant can make a showing that such extension would not be futile..... 5

   A.    Any extension provided to Defendant to file a dispositive motion would be futile, because the factual record as it exists prohibits the Court from granting summary judgment to Defendant. .................................................................. 6

   B.    Hunter always had positive performance evaluations until he filed an ERD complaint alleging race discrimination in a promotion, after which Defendant placed Hunter on the fast track to termination – pausing only momentarily when the State was actively investigating the race discrimination claim. ............................. 7

   C.    Sgt. Guyton, Plaintiff's then first line supervisor, has already testified that he was forced to take credit for false assertions on Hunter's enforcement numbers compared to his peers made in support of Hunter's termination. ............................. 10

   D.    Lt. Rembert, Hunter's then second line supervisor, has already testified that

i

although Hunter was terminated solely for not meeting his PIP goals, Hunter had actually met his PIP goals and was terminated anyway............................................. 11

E.    Hunter's then third line supervisor, Captain Carnahan, has already testified that part of the reason he terminated Plaintiff was because he considered Plaintiff to have a bad attitude *for making protected complaints of retaliation and discrimination*. …………………………………………………………………………………………12

F.    In addition to Defendant's blatant misrepresentation of enforcement data in the termination of Hunter, there is a plethora of additional evidence of abnormalities and pretext. ........................................................................................... 13

CONCLUSION.............................................................................................................................. 16

## I. Introduction

Defendant has filed an 11th hour motion for an extension of the scheduling order. Defendant does not come close to establishing good cause for an extension, under FRCP 16(b)(4) and LR 26(c), in which the primary consideration is Defendant's diligence.

Defendant represents it would like a 60 day extension of the Scheduling Order's February 20, 2026, discovery deadline *"in case we want to depose Hunter before summary judgment,"* but Defendant has never in the ninth months the Court provided for discovery sought Hunter's deposition. (Farrell Dec. ¶1-3.) This cannot establish good cause because Defendant failed to argue that Hunter's deposition testimony is "crucial" to summary judgment, and because Defendant "knew all along that [Plaintiff] was a potential witness in this case," such that there can be no good cause for not seeking Plaintiff's deposition during the nine months this Court provided for discovery in this case. *Hefti v. Brunk Indus., Inc.*, No. 14-C-729, 2015 WL 12616166, at *1 (E.D. Wis. July 7, 2015)

Defendant represents it would also like a 60 day extension of the Scheduling Order's March 20, 2026, deadline for dispositive motions, because after the Court issued the Scheduling Order in May, 2025 (Dkt. 15), defense counsel, in October of 2025, had a case in which the Court rescheduled a December 2025 trial to March 30, 2026. (Dkt. 18, ¶¶ 6-11.) Defendant does not explain why, when this trial conflict apparently arose in October 2025, it did not act promptly. Plaintiff's counsel has been scheduling all of her other obligations pursuant to the Scheduling Order (Dkt. 15) that has been in place for

1

almost a year now.  Nor does Defense counsel explain why it did not use its unexpected free time in December 2025, when the Court in the other case stayed that trial, to take discovery in *this case or to make a substantial start on its summary judgment submissions*.

Regardless, even despite the lack of good cause shown, Plaintiff would normally not object to a *short* extension of a few weeks of the dispositive motion deadline to accommodate one of the Defendant's attorney's apparent brief illness in January and workload.  However, Defendant's request of 60 days appears to be solely for delay, because based on the existing factual record, Defendant cannot make a good faith argument that this case has any chance of being dismissed in Defendant's favor on summary judgment, as explained more fully below.

This case is about Defendant's termination of Plaintiff Hunter in <u>2018</u>, and further delay will cause hardship to him and run afoul of FRCP 1, which aspires to a speedy trial for civil litigants. And, because an Arbitrator reversed the termination in 2019, Hunter has been in litigation with his current employer *since then* – and it has been long enough.

**II.      Defendant's motion is brought under the wrong rule, FRCP 6(b), as FRCP 16(b)(4) controls modification of a scheduling order – though both require Defendant to make a showing of "good cause."**

Rule 6(b) is not the appropriate vehicle for Defendant, because when more than one Rule covers similar ground, the specific controls over the general.  *See Rollins Burdick Hunter of Wisconsin, Inc. v. Lemberger*, 105 F.R.D. 631, 637 (E.D. Wis. 1985). The appropriate vehicle is FRCP 16(b)(4), providing:

2

> *Modifying a Schedule.* A schedule may be **modified only for good cause** and with the judge's consent.

FRCP 16(b)(4) (emphasis added.); *see also* LR 26(c) ("For good cause, the Court may extend the time during which discovery may occur.")

Though Defendant's motion was styled under the wrong Rule, Defendant did recognize its duty to establish "good cause" for extension. (Dkt. 18, ¶ 3.) Yet, Defendant "cites no authority and develops no argument supporting her implied assertion" of "good cause." *Sneider v. Cnty. of Waukesha*, No. 12-C-1217, 2014 WL 12644265, at *1–2 (E.D. Wis. July 7, 2014).

**III. Defendant has wholly failed to show "good cause" to extend discovery by even one day for the purpose of maybe taking Plaintiff's deposition – Defendant has never sought Plaintiff's deposition in the nine month's the Court provided for discovery.**

"Adherence to reasonable deadlines is critical to maintaining the integrity of court proceedings." *Mortle v. United Parcel Serv.,* No. 05-CV-117, 2006 WL 776745, at *1–2 (E.D. Wis. Mar. 27, 2006), *citing Spears v. City of Indianapolis,* 74 F.3d 153, 157 (7th Cir. 1996). Hence, good cause is shown when "unforeseen circumstances arise," but "absent exceptional circumstances, a party who wishes to introduce deposition testimony at trial should procure that testimony during the time set by the [C]ourt to conduct discovery." *Geneva Mfg., LLC v. Grand & Benedicts, Inc.*, No. 13-CV-1274, 2015 WL 6685386, at *2 (E.D. Wis. Oct. 29, 2015) (collecting cases.)

"Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking amendment." *Fricke v. Menard, Inc.*, No. 1:21-CV-03086-JPH-MKK, 2023 WL

3

167462, at *1 (S.D. Ind. Jan. 12, 2023), *quoting Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005).  "In other words, 'the good cause standard is met when the movant demonstrates that despite due diligence in discovery, the Court's case management deadlines cannot be met.'" *Id., quoting Stewardson v. Cass Cty.*, No. 3:18-cv-958-DRL-MGG, 2020 WL 5249453, at *1 (N.D. Ind. Sept. 3, 2020).[1]

Not only has Defendant failed to argue that Hunter's deposition testimony is "crucial" to summary judgment, but Defendant "knew all along that [Plaintiff] was a potential witness in this case," such that there can be no good cause for not seeking

---

[1] *See also*, *Anderson v. City of W. Bend Police Dep't*, 774 F. Supp. 2d 925, 934 (E.D. Wis. 2011) ("The court primarily considers the diligence of the party seeking amendment in making a good cause determination. If the moving party was not diligent, the inquiry ends." (internal quotation marks and citations omitted.)); *Hefti v. Brunk Indus., Inc.*, No. 14-C-729, 2015 WL 12616166, at *1 (E.D. Wis. July 7, 2015) ("The primary consideration in making a good-cause determination is the diligence of the party seeking the amendment. *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011)."); *Smetzer v. Newton*, No. 1:10-CV-93, 2012 WL 1900118, at *2 (N.D. Ind. May 23, 2012) ("To demonstrate good cause, a party must show that despite its diligence, the time table could not reasonably have been met."); *United States ex rel. Heath v. Wisconsin Bell, Inc.*, No. 08-C-0724, 2020 WL 13048896, at *2 (E.D. Wis. Oct. 20, 2020) ("Whether or not the [requested] deposition reveals any misconduct, Wisconsin Bell offers no reason to believe the misconduct would be related to an issue in the present case. A scheduling order may be modified only for good cause. Fed. R. Civ. P. 16(b)(4)… Wisconsin Bell has had ample time to complete discovery. Wisconsin Bell does not argue that it was recently surprised by the allegations related to Theo Marcus and made no attempt to depose Marcus itself in either this case or the D.C. case. Further, Wisconsin Bell offers no non-speculative reason to believe any alleged malfeasance on the part of Marcus would be related to this case. I do not find good case to extend the scheduling deadlines."); *see also Shaw v. Cnty. of Milwaukee*, No. 22-C-97, 2022 WL 17092075, at *2 (E.D. Wis. Nov. 21, 2022) ("Although Shaw asserts that he "has issues with some of the [defendants' discovery] responses and needs to conduct further discovery to follow up on his previous discovery requests, he has not explained what discovery requests are still outstanding. Shaw has had ample time to conduct meaningful discovery in this case. He has not established good cause to extend the discovery and dispositive motion deadlines by five months."); *c.f. Brown v. Seabul*, No. 16-CV-1463-PP, 2017 WL 6033542, at *1 (E.D. Wis. Oct. 17, 2017) (good cause shown to extend discovery and dispositive motion deadlines where one party unreasonably failed to provide information timely requested in discovery that was necessary for the resolution of dispositive motions.)

4

Plaintiff's deposition during the nine months this Court provided for discovery in this case.[2] *Hefti v. Brunk Indus., Inc.*, No. 14-C-729, 2015 WL 12616166, at *1 (E.D. Wis. July 7, 2015); *See also Geneva Mfg., LLC v. Grand & Benedicts, Inc.*, No. 13-CV-1274, 2015 WL 6685386, at *2 (E.D. Wis. Oct. 29, 2015) ("it knew from the earliest stages of this case that Santoro may have discoverable information and that it may use her to support its claims….Its decision to forego deposing her is one that cannot be undone now" at the close of discovery.); *Hadaway v. City of Milwaukee*, No. 19-CV-1106-PP, 2023 WL 3170171, at *2–3 (E.D. Wis. Apr. 28, 2023) ("The defendants have known about Ott for years…Under any view of the facts, Ott's relevance to this litigation and role as a fact witness are no surprise to the defendants…Nothing in the defendants' motion explains why they did not serve Ott with a notice of deposition before….")

Without having provided such information to the Court, the Defendant has *not* met the good cause standard. *Id*.

**IV.** **Defendants failed to show "good cause" to extend the summary judgment deadline by 60 days, though Plaintiff would not be opposed to a *short* extension of the deadline to accommodate Defense Counsel's trial schedule in *Mahmoud v. Board of Regents*, if Defendant can make a showing that such extension would not be futile.**

In spite of Defendant's inability to meet the good cause standard because it did not act with diligence upon learning, in October 2025, of a scheduling conflict caused by

---

[2] Moreover, because Hunter's termination was appealed and reversed by an Arbitrator in 2019, resulting in a full transcript, (Dkt. 20-21), and then litigated in an ERD hearing in 2023, resulting in a full transcript, (Dkt., 22-25), Defendant has already had ample opportunity to cross examine Hunter. There was no reason for delaying Hunter's deposition, if Defendant had additional questions, upon the Court's issuance of the Scheduling Order in this case on May 15, 2025. (Dkt. 15.)

a March 30, 2026, trial[3] and in spite of its failure to alert Plaintiff or the Court until mid-February, 2026, of this apparent conflict, obviously resulting in the Court and the Plaintiff continuing to schedule *all other matters* around the *existing* Scheduling Order (Dkt. 15) in this case, Plaintiff would not oppose a *short* extension to accommodate defense counsel's workload, as long as Defendant can make a reasonable preliminary showing that the extension would not be futile.

There is no "good cause for delaying resolution of this action," if there will be no summary judgment motions due to disputes of material facts. *Wilber v. Manlove*, No. 21-C-521, 2021 WL 5907904, at *1 (E.D. Wis. Dec. 14, 2021). Rather than delaying justice on a speculation, the Court should make certain "whether Defendants will move for judgement," otherwise, delay "is unwarranted." *Id.*

>    A. **Any extension provided to Defendant to file a dispositive motion would be futile, because the factual record as it exists prohibits the Court from granting summary judgment to Defendant.**

This case is a Title VII discrimination and retaliation case, in which the "sole question the court must consider is whether the plaintiff has adduced sufficient evidence to allow a reasonable jury to infer intentional discrimination because of a protected characteristic." *Mahmoud v. Bd. of Regents of the Univ. of Wisconsin Sys.*, No. 24-

---

[3] Defense counsel in this case are two of among four attorneys representing the defendant in that case, and they have not represented that they will be the trial attorneys. *Mahmoud v. Bd. of Regents of the Univ. of Wisconsin Sys.*, No. 24-CV-384-JDP, 2026 WL 242087, at *1 (W.D. Wis. Jan. 29, 2026). Nor have they represented that the trial is likely to actually go forward, rather than be settled or subject to interlocutory appeal.

CV-384-JDP, 2026 WL 242087, at *8 (W.D. Wis. Jan. 29, 2026), *citing Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). For example, evidence that Defendant departed from its usual practices and/or stated pretextual reasons in its termination of the plaintiff, or otherwise treated similarly situated employees better, will generally be sufficient for a Plaintiff to survive summary judgment. *Id.*

In the case at bar, there is such a plethora of evidence that would allow a reasonably jury to infer discrimination and retaliation, it would be futile for Defendant to move for summary judgment. Defendant's supervisors have already admitted that Hunter was performing on par or better than his similarly situated peers, and had improved in every category he was asked to on the PIP, and was terminated anyway. And, though the evidence presented below is just the tip of the iceberg of the complete record, it demonstrates the futility of any attempt by Defendant to have the case dismissed in it's favor on summary judgment.

> **B.** **Hunter always had positive performance evaluations until he filed an ERD complaint alleging race discrimination in a promotion, after which Defendant placed Hunter on the fast track to termination – pausing only momentarily when the State was actively investigating the race discrimination claim.**

The timeline in this case is as follows:

| 2007-2014 | *Annual Performance Evaluations* | All Meets Expectations |
|---|---|---|
| August 2014 | Mr. Hunter files ERD Race Discrimination Complaint in Promotion | |
| 3/31/15 | *Annual Performance Evaluation* | Need Improvement |

7

| | | |
|---|---|---|
| 9/30/15 | ERD grants Mr. Hunter Probable Cause and sets for Hearing | |
| 3/31/16 | *Annual Performance Evaluation* | Meets Expectations |
| 6/2016 | ERD Complaint settled and dismissed | |
| 3/31/17 | *Annual Performance Evaluation* | Need Improvement |
| 4/2017-2/2018 | *Performance Improvement Plan* | Unsatisfactory |
| 2/2018 – 8/28/2018 | *Final PIP* | Unsatisfactory |
| 8/30/18 | *Termination (appealed by Hunter)* | |
| 9/10/19 | Arbitration Award finding termination not supported by just cause, ordering DOT to reinstate Mr. Hunter as Trooper | |

Hunter is the *only* known trooper in the State to have been placed on a Final PIP. (Dkt. 25, ERD Tr. 903:22-904:19; Dkt. 22, ERD Tr., 131:24-122:8; *see also* Dkt. 23, ERD Tr., 482:9-14.)

In the regular course of business, the first line supervisor, Sgt. Guyton would be responsible for the  PIP, and ER/HR would be involved – however, in this case, Carnahan set up the PIP without ER/HR's involvement *or knowledge*.   (Dkt. 22, ERD Tr., 118:16-120:1, Dkt. 23, ERD Tr. 510:1-13; Dkt. 25, ERD Tr., 929:15-931:23.)  Carnahan placed Hunter on a PIP without HR's knowledge, testifying he could terminate a trooper under the "**guise**" of "performance"  through the use of Performance Improvement Plans (PIP).  (Dkt. 22, ERD Tr., 97:8-98:22.)

The primary evidence the DOT used to support termination was enforcement data.  (Dkt. 25, ERD Tr., 861:1-9.)  Defendant has already admitted that Hunter's similarly-situated peers were troopers working in the SE region on the overnight shift.

8

(Dkt. 22, ERD Tr., 174:10-20; 177:13-18.)  And, that of his similarly situated peers, Hunter is the only African American, and the only trooper to have asserted his rights in an ERD case.  (Dkt. 22, ERD Tr., 171:18-172:12.)

Carnahan testified earlier that his "assumption" was that many of Hunter's numbers were the lowest of the midnight troopers in the SE region, when the truth is, in *no category* was Hunter the lowest.  (Dkt. 22, ERD Tr. 184:3-185:7.)  Hunter was the second highest performer in OWI enforcement, the second highest performer in criminal enforcement, and in the middle of the pack in seatbelt enforcements and speed enforcement. (Dkt. 22, ERD Tr., 171:18-20; 174:10-177:18, 178:15-23; Dkt. 25, ERD Tr. 859:15-860:1.)  Adding all of the citations and warnings together, to get a broad view of enforcement activity, there were three troopers writing more citations and warnings than Hunter, and six writing fewer - again, Hunter was above-middle of the pack.  (Dkt 22, ERD Tr. 180:5-1.)  Using the Defendant's *own enforcement data* it is clear to see that Hunter was not a low-performing trooper but a *top performing trooper*:



Hunter was terminated as the 4th top performing trooper, and the six similarly-situated troopers with lower enforcement numbers were not even put on performance improvement plans.

> **C.      Sgt. Guyton, Plaintiff's then first line supervisor, has already testified that he was forced to take credit for false assertions on Hunter's enforcement numbers compared to his peers made in support of Hunter's termination.**

Sgt. Guyton, as Hunter's first line supervisor, has already testified, that in addition to misrepresenting *Hunter's* enforcement data, Carnahan misrepresented the data of *similarly situated troopers* to make Hunter's enforcement look low when it was not:

Q.      And it says, "This means that with regard to speed and restraint enforcement action, he averaged less than one enforcement contact in either category per shift," right?

A.      Yes.

Q.      And that, if you are presenting it to a bunch of HR staff that don't know jack about being a trooper, that might seem kind of shocking, right?

A.      That's possible.
…
Q.      Okay. In reality, every single one of your southeast troopers working the midnight shift is averaging less than .25 OWIs per shift, right?

A.      Okay.

Q.      Every single one?

A.      Yes.

Q.      And every single one of your southeast troopers is averaging less than .72 - .72 or less enforcement actions in seat belts per shift, right?

A.      Yes.

…

Q.      So these numbers are just, like, normal and average, right?

A.      Compared to that, yes.

Q.      Yeah.  Did you – I want to draw your attention to Page 8 where this says traffic stops during the FPIP, Trooper Hunter made an average of 2.41 traffic stops per shift…Other troopers had between 1.65 and 5.76[4] times the number of stops as did Trooper Hunter, right?

A.      Yes.

Q.      Did you write that?

A.      No.

…

Q.      If you had  realized that these numbers were wildly misrepresented, would you have talked to supervision about that?

A.      Yes.

Q.      And would you have talked to HR about that?

A.      Yes.

(Dkt. 24, ERD Tr. 661:17-664:19; 665:15-21.)


        **D.      Lt. Rembert, Hunter's then second line supervisor, has already testified that although Hunter was terminated solely for not meeting his PIP goals, Hunter had actually met his PIP goals and was terminated anyway.**

Lt. Rembert, as the second line supervisor, has already testified that Hunter was

---

[4] No Trooper had anywhere near 5.76 times the number of traffic stops as Hunter – *see* the graph provided on page 9, above.

solely terminated for "performance" and not meeting his PIP enforcement number goals (dkt 25, ERD Tr.861:1-9), and then proceeded to summarize Hunter's paradoxical situation succinctly:

> Q. And do you see that despite working fewer hours every year, he has increased his traffic stops every year, like he was directed to on this performance improvement program?
>
> A. I see that.
>
> Q. And that he has increased his speeding enforcement every year despite having fewer hours on duty to complete those enforcement actions? Do you see that?
>
> A. I see that.
>
> Q. And he's got more – he's increased across the board, right? He's increased his seatbelt citations, he's increased his OWI citations, and he's almost even increased all of his criminal arrests, as well, right?
>
> A. Correct.
>
> Q. And he's increased his traffic stops between 2016 and 2018 like he was instructed to do, right?
>
> A. Correct.

(Dkt 25, ERD Tr. 886:15-887:15.)

> **E. Hunter's then third line supervisor, Captain Carnahan, has already testified that part of the reason he terminated Plaintiff was because he considered Plaintiff to have a bad attitude *for making protected complaints of retaliation and discrimination.***

Carnahan has already testified that either he, Lt. Rembert, or Sgt. Guyton documented Plaintiff's protected complaints of discrimination and retaliation as a factor

12

in the decision to terminate Plaintiff. (Dkt. 19, Carnahan Dep., p. 270-271.) Carnahan considered Hunter's complaints of discrimination and retaliation to be "insubordination." (Tr. 165:2-8.) Moreover, Lt. Rembert testified that Hunters' retaliation and discrimination complaints made during the PIP period were not handled purusant to normal practice but were simply buried:

> Q.     So is it that Hunter was alleging retaliatory and discriminatory actions by command staff, and then you decided, well, he's lying, so I'm not going to send it to HR or any proper channels to be investigated?
>
> A.     That would be correct because – I was personally there. I didn't see any of that.
>
> Q.     And is that your understanding of what the Department of Transportion normal business procedure is, if an employee claims that they're fearing retaliation and discrimination, the supervisor can just say, "Huh, I don't believe it" and not pass it up for review?
>
> A.     No, no, that's not normal practice.

(Dkt. 25, ERD Tr. 879:3-16.)

> **F.     In addition to Defendant's blatant misrepresentation of enforcement data in the termination of Hunter, there is a plethora of additional evidence of abnormalities and pretext.**

In addition to a complete and intentional misrepresentation of enforcement numbers of both Hunter and his similarly situated peers, the paperwork used to support and make a case for Hutner's termination was *littered* with pretext. By way of example:

- The paperwork reflects that Hunter "became defensive" when supervision tried to address an "unsafe" search of a vehicle without a backup officer

present, when the actual *audio recording* of this conversation is quite the opposite, with the Lieutenant telling Hunter he did not do anything wrong on that search, period. (Dkt. 25, ERD Tr. 860:23-867:15.)[5]

- The paperwork reports that Hunter abused his discretion by giving a warning rather than a citation and then was dismissive of his supervisor's concerns during the meeting about it. But, the actual audio recording of this meeting proves that Hunter's discretion was reasonable, calmly explained, and depicts nothing that could be fairly catagorized as dismissive or truculant. (Dkt. 25, ERD Tr. 953:11-955:10.)

- The paperwork reports that Hunter was terminated in part because, though his reports were well written and professional, he was reviewing his videos in detail while writing his reports to ensure they were fully accurate, which

---

[5] Lt. Rembert never spoke up to correct the misrepresentation on the termination documentation:

Q. Did you voice up during that meeting like, "I'm concerned about this document that we're relying on, this is not a good reason to terminate someone, I acutally told him he didn't do anything wrong, and his attitude was pretty good"?

A. I did not.

Q. Why not?

A. Because my vote was based on the overall performance of that time period, the final performance improvement plan.

Q. Not so much asking about your vote, but you knew there were people from HR voting; right?

A. That's correct.

Q. And those people from HR are not familiar with Trooper Hunter on an individual level at all and probably don't even know what it takes to be a trooper, if we're being honest, right?

A. Correct.

Q. And you knew that they were going to be relying on the words in this document for their vote; right?

A. That's correct.

(Dkt. 25, ERD Tr. 867:20-868:19.)

14

the employer alleged was a time-wasting practice. (Dkt. 24, ERD Tr. 582:3-583:13.) However, not only is reviewing video while writing a report best practice (*see e.g.* Dkt. 22, ERD Tr. 299:2-25), it has actually been a required policy of DOT since January of 2018, eight months prior to Hunter's terimination. (Dkt. 23, ERD Tr., 421:19-423:3.)

- Similarly, the write-up of the April, 2018, meeting notes portrayed that Sgt. Guyton had a problem with how long Hunter was taking to write a police report, but the actual audio recording of that meeting depicts Sgt. Guyton telling Hunter, "I don't have an issue with his report writing. He writes a very well-written report. It takes time. I give him credit." (Dkt. 23, ERD Tr. 467:8-25.)

- The termination paperwork shows Hunter – a decorated, experienced trooper, was terminated in part for having scuffs in his leather belt and a corroded badge. (Dkt. 23, ERD Tr. 456:7-24.) However, it was not Hunter's responsibility to supply himself with these items; DSP provides the duty belt and badges to troopers. (Dkt. 23, ERD Tr. 456:20-457:20, 529:10-23.) If Hunter's badge and belt showed his decade of service, Defendant could have, but did not, simply replaced these items. (Dkt. 23, ERD Tr. 456:20-457:20, 529:10-23.)

- Carnahan testified previously that one of Hunter's performance problems was that the District Attorney had sent emails, to Carnahan personally, complaining that Hunter was not getting reports, citations, and evidence submitted in a timely manner. This was, as the DOT later stipulated, untrue. (Dkt. 22, ERD Tr. 158:6-160:17.)

- Defendant represented that Carnahan and Guyton were unaware of Hunter's ERD activity and therefore could not possibly have been acting in retaliation for the same; however, both Carnahan and Guyton had been well aware of Hunter's ERD activity. (Dkt. 22, ERD Tr. 71:11-73:3, 74:3-76:20, 79:6-15, Dkt. 24, ERD Tr. 534:22-539:2.)

- The termination documentation represents that Hunter made "no substantive changes to his work performance" despite the PIP and FPIP, to provide the false impression that Hunter is "capable of achieving the employer's reasonable goals and performance expectations. *He just refuses to*," when the truth is, Hunter steadily increased his enforcement just as requested between 2016 and 2018. (Dkt. 23, ERD Tr. 473:21-24; 532:12-24; 533:6-25.)

15

And finally, Defendant has to contend with the evidence that it is unheard of for an experienced trooper, outside of the probationary period, to be terminated for "poor performance;" and generally only work-rule violations will lead to termination[6] of an experienced trooper like Hunter. (Dkt. 22, ERD Tr. 300:1-301:2; 325:15-326:6.) This is, in part because, the Wisconsin legislature, in its wisdom, has made it illegal to give quotas to law enforcement officers, illegal to require a certain number of traffic stops or citations per shift, and even illegal to tell a trooper a range of enforcement activity which management would find acceptable. (Dkt. 23, ERD Tr. 401:6-402:14; *see also* Dkt. 25, Tr. 964:18-965:3.) However, despite *very intense* monitoring of Hunter, including 24/7 *video surivillance* to *look* for a work-rule violation, Defendant *never found one.* (Dkt. 22, ERD Tr. 126:10-14; Dkt. 23, ERD Tr. 528:14-529:17.)

Hence, no matter how well Defendant can guild the lily on summary judgment, it will simply not be entitled to summary judgment, purely because of inferences the jury could reasonably reach from, for example, any of the above evidence that is already in the record.

**CONCLUSION**

In conclusion, the Defendant's motion for an extension of discovery to give them an additional 60 days to take Plaintiff's deposition if they decide to do so should be denied for failure to establish good cause. Defendant's motion for an extension of the

---

[6] It is rare, in fact, for a non-probationary trooper to be terminated even for work rule violations. (Dkt. 22, ERD Tr. 301:2-9.)

16

dispositive motion deadline also fails to meet the good cause standard, but Plaintiff would not object to a *short* extension to accommodate defense counsel's workload and the brief illness of one of Defendant's attorneys in January, *if Defendant* can make a preliminary showing that a motion for summary judgment in their favor would not be futile.

Dated this Monday, February 16, 2026.

Respectfully submitted,

Tavaris Hunter,

Plaintiff,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
ANDREA J. FARRELL
State Bar Number 1064773
1025 Quinn Dr., Suite 500
Waunakee, WI 53597-2502
Phone        608/283-6001
Fax          608/283-0945
Email:       jsolson@scofflaw.com
             ajf@scofflaw.com

/s/ Andrea J. Farrell

_____

Andrea J. Farrell
ATTORNEY FOR PLAINTIFFS

17