# United States District Court
## Eastern District of Wisconsin

Tavaris Hunter,

       Plaintiff,

                       Case No.  25-cv-70-NJ

    v.

Department of Transportation,

       Defendant.

### Plaintiff's LR 56 Motion for Summary Judgment

In August, 2014, Trooper Hunter filed an EEOC race discrimination case (litigated in the ERD pursuant to their work-sharing agreement) against the DOT-DSP, specifically naming DSP Superintendent (then Captain) Carnahan. Hunter was the only African American trooper in his troop, and the only trooper to have ever filed a race discrimination complaint under Carnahan's supervision. At the first performance review following dismissal of that case in late 2016, Carnahan placed Hunter on a discriminatory and retaliatory PIP leading to termination.  Carnahan made Hunter keep his squad camera rolling 24/7 for more than a year and secretly monitored Hunter's computer looking for a work rule violation but was never able to find one.  In August 2018, in order to secure the first non-work-rule related termination of a non-probationary DSP trooper *in history*, Carnahan resorted to reporting that Hunter was the lowest performing trooper and either could not or would not do his job. DOT-DSP data actually showed that Hunter was the second highest in OWI enforcement and criminal enforcement, and right in the middle of his similarly situated peers in all other areas at the time he was terminated for being, allegedly, the lowest performing trooper.  Carnahan admitted, in writing, in his termination report to DSP, that Hunter was terminated in part because he believed he had "retaliatory/discriminatory command staff."  Carnahan funneled all of this through an African American sergeant, in a thinly veiled attempt to disguise race discrimination, meanwhile denying that sergeant all the decision-making authority that DOT-DSP White sergeants routinely receive. Because no reasonable jury could find that race and retaliation were not the real reason Hunter was terminated, summary judgment should be granted in favor of Plaintiff, leaving only the issue of damages for trial.

1

# Table of Contents

I.      Summary Judgment Introduction. ..........................................................................................1

II.     Title VII Discrimination and Retaliation are Both at Issue in this Case. ...............................1

III.    In Title VII Cases All Evidence Must be Considered as a Whole...........................................2

IV.     A jury would be compelled on the record as a whole to find that if not for Hunter's race discrimination complaints he would not have been terminated, and that race was also factor in Hunter's termination. .................................................................................................................4

    A.    Case Summary....................................................................................................................4

    B.    Supervisory structure is relevant because then Captain, now Superintendent, Carnahan, should have never been so fixated with the supervision of, nor involved with performance reviews of, a trooper. .................................................................................................................5

    C.    DOT always found Hutner to meet expectations between 2007 and 2014. .........................6

    D.    Fall of 2014 – Hunter filed race discrimination complaints. ..................................................6

    E.    March, 2015, Hunter received his first ever negative performance review, and it was drafted not by his first line supervisor, Sgt. Guyton, but *atypically* by Carnahan. ......................7

    F.    2016 – ERD granted Hunter Probable Cause and Carnahan stepped back. .........................7

    G.    March 2017 – Hunter's first performance review after the discrimination case was settled was the *worst evaluation* Hunter ever received, again *atypically* drafted by Carnahan. ...............8

    H.    April 2017 – Hunter was placed on a PIP instructing him to "increase" his enforcement in three areas: speed, seatbelt use, and OWI enforcement.............................................................8

    I.    The PIP was pretext for a *predetermined* termination. .................................................8

    J.    Carnahan's PIP instruction that Hunter needed to "increase" his citations in certain areas was so pretextual it boarded on *illegal*....................................................................................9

Case 2:25-cv-00070-NJ    Filed 04/15/26    Page 2 of 34    Document 31

K. Carnahan's alleged reason for the PIP – to make Hunter a more well-rounded trooper who focused on traffic citations instead of criminal interdiction – was pretextual....................11

L. The PIP was designed to attempt to generate information that could later be used to try to convince an Administrative Review Panel to terminate Hunter.............................................13

M. Carnahan subjected Hunter to a draconian level of supervision and yet Hunter never had a work-rule violation throughout the PIP. ...............................................................................15

N. Carnahan wildly misrepresented Hunter's true performance in the Administrative Review Packet to induce the Committee to take the unheard of step of terminating a trooper for not writing enough citations. ......................................................................................................17

O. All smilarly situated employees were treated more favorably because they did not have their lawful use of "officer discretion" curtailed by Carnahan despite at least half of them having had lower enforcement activity than Hunter. ...................................................................18

P. There is the rare "direct evidence" in this case that Hunter's race discrimination and retaliation complaints were the reason for his termination. .........................................................21

Q. It is inescabable that race was a factor, because Carnahan carefully funneled the negative employment actions through an African American supervisor, Sgt. Guyton, while simulationaulsy denying Sgt. Gutyon a vote in whether Hunter should be terminated, despite DOT's practice of always allowing White supervisors a vote........................................................22

R. DOT-DSP's failure to follow its own procedure for handling Hunter's discrimination complaints further demonstrates that retaliation was the true motivation.................................26

S. Additional evidence of pretext..............................................................................................28

T. In *defense* of the unlawful termination of Hunter, even more lies were told.......................28

U. The record as a whole would not allow any reasonble jury to believe DOT's termination of Hunter was legitmate, as the record as a whole has eliminated *any* reason to terminate Hunter other than discrimnation and retaliation. ..........................................................................30

3

## I. Summary Judgment Introduction.

Rule 56 provides the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). A "genuine dispute" exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, vague disputes and metaphysical doubts will not do. *McCollum v. Drewitz*, No. 21-CV-316-JPS, 2022 WL 4776279, at *4 (E.D. Wis. Oct. 3, 2022) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts … Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").

## II. Title VII Discrimination and Retaliation are Both at Issue in this Case.

Title VII prohibits two types of discrimination: "core discrimination" consisting of negative employment actions on the basis of protected class status; and "retaliation" for opposing protected class discrimination in the workplace or filing an EEOC discrimination complaint. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-62 (2006). Simply put, the "substantive provision seeks to prevent injury to individuals based on who they are, *i.e.,* their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct." *Id.* at 63. (internal citation omitted.) "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses…Interpreting the antiretaliation provision to

1

provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* at 67. Hence, "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. Core discrimination is unlawful if the employee's protected class was *one* factor in the negative employment action, "even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). Retaliation "must be proved according to traditional principles of but-for causation" of intentional torts, requiring "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

**III.     In Title VII Cases All Evidence Must be Considered as a Whole.**

There is no particular evidentiary framework by which one must prove discrimination, rather, "the sole question the court must consider [in denying Defendant's motion for summary judgment] is whether the plaintiff has adduced sufficient evidence to allow a reasonable jury to infer intentional discrimination because of a protected characteristic." *Mahmoud v. Bd. of Regents of the Univ. of Wisconsin Sys.*, No. 24-CV-384-JDP, 2026 WL 242087, at *8 (W.D. Wis. Jan. 29, 2026), *citing Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). In all of these cases, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), can still be helpful to litigants, but post *Ortiz*, "all evidence" is considered "in a single pile" and "evaluated as a whole." *Id.*

2

at 766.  *See also Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).  Every one

of the most common types of evidence on which courts traditionally rely is present in this case:

- Deviations "from standard procedures [which] can serve as circumstantial evidence of discrimination," allowing a reasonable jury to infer discrimination.  *Id.* at 9, *quoting Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017).

- Evidence that similarly situated employees were treated better. *Id.* at 10, *citing Perez v. Thorntons, Inc.*, 731 F.3d 699, 708–09 (7th Cir. 2013).

- Evidence that " the employer's stated reasons for an employment action are pretextual: "'Where ... there is a question of fact as to the believability of an employer's purported reasons for an employment decision ... it suffices to defeat the employer's summary judgment motion.'"  *Id.* at 9, *quoting Greengrass v. Int'l Monetary Sys. Ltd.,* 776 F.3d 481, 487 (7th Cir. 2015); *see also Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination.")  This may mean that the reason is a lie, or it may be a true assertion of fact, but one that did not "actually motivate" the decision. *Id.* at 9.

- Evidence that the employer is lying in general. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000) ("the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." (citation and internal quotations omitted.); *McCottrell v. White*, 933 F.3d 651, 658 (7th Cir. 2019) ("And if a jury not only rejected the defendants' assertion but also concluded that the defendants affirmatively lied about the direction of fire, that lie would be additional circumstantial evidence supporting the inference that the shot was aimed toward the plaintiffs."); *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995) ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment.")

- Rarely, as in the case at bar, a case will have "direct evidence," of "something close to an explicit admission by the employer that a particular decision was motivated by discrimination," which "uniquely reveals" the employer's intent to discriminate.  *Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 587 (7th Cir. 2011).

3

**IV.    A jury would be compelled on the record as a whole to find that if not for Hunter's race discrimination complaints he would not have been terminated, and that race was also factor in Hunter's termination.**

**A. Case Summary.**

Plaintiff Tavaris Hunter began working for Defendant Department of Transportation (DOT) Division of State Patrol (DSP) as a law enforcement officer, at the rank of Trooper, in 2007. (PPFOF 1, 14.)  Every one of Hunter's annual reviews as a Trooper between 2007 and 2014 met expectations. (PPFOF 14.)  Between 2014 and 2016, Hunter litigated an ERD/EEOC race discrimination complaint against DOT DSP, alleging he had been passed over for criminal interdiction positions for less qualified White troopers. (PPFOF 1, 17.)  At the next annual review of troopers, in 2017, Hunter was placed on a Performance Improvement Plan (PIP) – not by his direct supervisor, but by now Superintendent, then Captain/Regional Commander, Tim Carnahan - that led to a "Final PIP" (FPIP) resulting in Hunter's termination on August 30, 2018, for allegedly focusing too much on criminal interdiction and not writing enough traffic citations[1]– a negative employment action that is unheard of for non-probationary troopers. (PPFOF 2, 41, 54-55, 58, 72-73, 101.)

Carnahan knew that Hunter's race discrimination complaint had named Carnahan, personally, as the offending party.  (PPFOF 104.)  Hunter was the only African American trooper in his Troop, and the only trooper under Carnahan's supervision who had filed a race discrimination complaint.  (PPFOF 6-7.)  **Defendant has never placed a Trooper other than Hunter on a**

---

[1] *But see* Wis. Stat. § 349.025 "**Quotas relating to the enforcement of traffic regulations prohibited."**  (PPFOF 105.)

4

**Final PIP between 1994 and 2025.** (PPFOF 27.) Hunter appealed his termination internally through the Union, and in September, 2019, the Arbitrator found Hunter's termination had not been supported by just cause and ordered his reinstatement as a trooper. (PPFOF 2-3.) Since his return to work, Hunter's performance evaluations once again meet expectations – and specifically note that Hunter more than makes up for lower traffic citations with his thorough criminal investigations and enforcement. (PPFOF 28.)

Discovery, unavailable in the Union appeal but uncovered in this case, revealed that Carnahan had misrepresented Hunter's enforcement data (i.e. number of citations/warnings per shift) at the time of termination to make it look as if Hunter was the lowest performing trooper, but the *actual* enforcement data shows that Hunter was the second highest among his similarly situated peers in both OWI enforcement and criminal enforcement and in the middle of his peers in seatbelt and speeding enforcements. (PPFOF 39.) Whether a jury could reasonably find the motivation for Hunter's termination was *anything but* discriminatory and retaliatory is the issue before the Court.

**B. Supervisory structure is relevant because then Captain, now Superintendent, Carnahan, should have never been so fixated with the supervision of, nor involved with performance reviews of, a trooper.**

Between October, 2013, and Hunter's termination in August, 2018, Hunter's Troop's first level supervisor was Sgt. Guyton (Black/African American), the second level supervisor was the lieutenant, and the third level supervisor was Captain Tim Carnahan.[2] (PPFOF 8-9.) The sergeant is

---

[2] Defendant DOT DSP's Superintendent Tim Carnahan was Captain (aka Regional Commander) of the SE Region between 2011 and February 2018. (PPFOF 4.)

primarily responsible for reviewing each trooper's performance.  (PPFOF 20.)  If for some reason the sergeant had difficulty, the lieutenant would be expected to assist.  (*Id.*)  It is atypical for a third level supervisor like the Captain to be involved in drafting performance reviews for troopers.  (*Id.*)  Captain Carnahan supervised lieutenants (including the lieutenant of Plaintiff Hunter's Region/Troop). The lieutenants supervised seven sergeants, and the *sergeants* each supervised a troop of eight troopers. (PPFOF 5.)  Carnahan's heavy-handed intervention into mundane supervisory tasks over Hunter, including inserting negative comments into his personnel reviews, and obsessive monitoring of Hunter (as discussed in depth below) was highly unusual given Carnahan's rank of Captain; the third level supervisor of hundreds of troopers.  *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) ("Birch's intervention was highly unusual given her position in the corporate hierarchy," and this suggested unlawful motivation.)

### C.  DOT always found Hutner to meet expectations between 2007 and 2014.

Prior to filing a race discrimination complaint, Hunter consistently met expectations in every quarterly and annual performance evaluation between his hire in 2007 and 2014. (PPFOF 14.)  In Hunter's performance review in March, 2014, Sgt. Guyton scored Hunter as exceeding expectations in communications and diversity,  and meeting expectations in all other areas. (PPFOF 15.)  The review also  complimented Hunter on his excellent criminal interdiction skills and encouraged Hunter to apply for additional criminal assignments and training opportunities.  (PPFOF 15.)

### D.  Fall of 2014 – Hunter filed race discrimination complaints.

In August 2014, Hunter filed race discrimination complaints, both internally and with the ERD/EEOC, alleging he had been encouraged to apply for promotion to criminal interdiction

6

positions by his then supervisors, but, when he had applied, he had been passed over for less qualified white troopers. (PPFOF 1, 17.) Following the DOT's internal investigation in August, 2015, Affirmative Action Officer Maya Rudd found that "there were inconsistencies in 2014 which you may feel could support your allegations" as to the criminal interdiction hiring. (PPFOF 18.) The ERD found probable cause to believe discrimination had occurred. (PPFOF 23.)

### E. March, 2015, Hunter received his first ever negative performance review, and it was drafted not by his first line supervisor, Sgt. Guyton, but *atypically* by Carnahan.

As is typical of the chain of command, Carnahan had no input into Hunter's "meets expectations" reviews, prior to Hunter's race discrimination complaint. (PPFOF 16.) Hunter's March, 2015, performance evaluation was, for the first time, "Needs Improvement," and for the first time was not drafted alone by his Sergeant; rather, atypically, negative comments were directly inserted by Captain Carnahan. (PPFOF 19-20.) In attempt to explain his atypical involvement, Carnahan testified that he drafted some of Trooper Hunter's performance reviews beginning in 2015, because Sgt. Guyton (who was Black) had "no pride," "no knowledge" or "foresight," did not come from the trooper-side of law enforcement, and did not have a lot of background or experience, and had an inability to write well. (PPFOF 20-21.) However, Captain Carnahan did not draft portions of any *other* trooper's performance review to accommodate Sgt. Guyton's alleged deficiencies. (PPFOF 22.)

### F. 2016 – ERD granted Hunter Probable Cause and Carnahan stepped back.

After the ERD granted probable cause in the promotion case and while the ERD case was in the discovery phase in the spring of 2016, Sgt. Guyton drafted Hunter's performance review as

7

"Meets Expectations." (PPFOF 23.) In June of 2016, that ERD case was settled and dismissed. (PPFOF 24.)

### G. March 2017 – Hunter's first performance review after the discrimination case was settled was the *worst evaluation* Hunter ever received, again *atypically* drafted by Carnahan.

After the discrimination case was settled and dismissed by the ERD in June, 2016, Carnahan again drafted the negative portions of Hunter's performance evaluation. (PPFOF 24.) Sgt. Guyton, as Hunter's direct supervisor, wrote about the excellent police work Hunter had accomplished throughout the year, such as saving a person from a burning vehicle and arresting two wanted serial gas station robbers. (PPFOF 25.) However, based on the negative comments added by Carnahan, Hunter's March, 2017, rating was "Needs Improvement," and was the worst review Hunter had ever received. (PPFOF 24.)

### H. April 2017 – Hunter was placed on a PIP instructing him to "increase" his enforcement in three areas: speed, seatbelt use, and OWI enforcement.

Based on the two "needs improvement" reviews of March, 2015, and March, 2017, in April, 2017, Hunter was placed on a Performance Improvement Plan (PIP) through February 2018, and scored "Unsatisfactory," leading to a Final PIP (FPIP) between February and August 2018. (PPFOF 26.) During the PIP/FPIP, Hunter was instructed that his primary goal was to increase his enforcement (i.e. number of citations and warnings) in speed, seatbelt use, and OWIs. (PPFOF 29.)

### I. The PIP was pretext for a *predetermined* termination.

In the normal course of business, the first line supervisor, here Sgt. Guyton, would be responsible for conducting the Final PIP, but in this case, Carnahan set the parameters. (PPFOF

8

79.)[3] In the regular course of business, Employee Relations/HR would be involved in the placement of a trooper on a PIP so as to help guide management through the process, but ER/HR did not learn Hunter was on a PIP until he had been on it for eight months. (PPFOF 104.)

It was Carnahan's understanding that there were two routes to terminating a trooper – (a) discipline-based (work rule violations), or (b) performance-based (lack of enforcement activity). (PPFOF 95.) Carnahan did not have the independent ability to authorize discipline at that time. Employee Relations (or HR) would have needed to approve, and the seven just-cause factors would have needed to be satisfied. (PPFOF 96.) However, Carnahan testified that he knew he could terminate a trooper under the "**guise**" of "performance" through the use of PIPs. (PPFOF 97.)

To start the PIP, Carnahan sat Hunter down with a binder explaining the very, very basics of how to be a trooper, despite the fact that Hunter had been an accomplished trooper for a decade already. (PPFOF 99.) Carnahan testified he created the binder <u>so that eventually he'd be able to testify</u> that he went through this information with Hunter in great detail. (PPFOF 100.) *See e.g. Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 645 (7th Cir. 2013) (employer's investigation seemed to have "predetermined outcome" which evinced retaliation.)

**J. Carnahan's PIP instruction that Hunter needed to "increase" his citations in certain areas was so pretextual it boarded on *illegal*.**

Carnahan did not set measurable goals such as that Hunter would be considered successful on the PIP if he issued X number of speeding citations, and made Y number of OWI arrests. The

---

[3] Almost immediately after Hunter's ERD case was filed, as early as September of 2014, Carnahan started collecting Hunter's data through the lieutenant, *without including Sgt. Guyton*, trying to catch Hunter having low levels of enforcement activity during shifts, even noting in writing that he **hoped** the stops Hunter made over his recent shifts occurred only when Sgt. Guyton was riding along with Hunter. (PPFOF 80.)

9

DOT-DSP does not support quotas, such that it would not require a trooper to have a certain *number* of traffic stops or citations per shift, or even a certain *range* of enforcement activity that management would find acceptable, in part because the Wisconsin legislature made it illegal to give quotas to law enforcement officers. (PPFOF 105.) *See also* Wis. Stat. § 349.025 "**Quotas relating to the enforcement of traffic regulations prohibited.**"; Wis. Stat. § 349.025(2) "No state agency…may require a law enforcement officer to issue a specific number of citations, complaints or warning notices during any specified time period for violations of traffic regulations." What is permissible is to evaluate job performance by comparing the "number of citations, complaints or warning notices issued by all law enforcement officers employed by the state agency…who have similar job duties and who serve in the same administrative unit…" Wis. Stat. § 349.025(3).

Troopers are afforded a great deal of professional discretion in enforcing the laws, as is cemented in the trooper position description and the Wisconsin oath of officers. (PPFOF 92.) Moreover, compassion to the community is one of DSP's official goals, and troopers are permitted to use their discretion to show compassion to violators, especially those that appear to be facing hardship. (PPFOF 93.) A trooper's professional oath requires him to swear that he, "alone" is "responsible for [his] own standard of professional performance." (PPFOF 91.) Micromanaging Trooper Hunters' discretionary enforcement activity was *so unusual and improper* it bordered on illegal.

10

**K. Carnahan's alleged reason for the PIP – to make Hunter a more well-rounded trooper who focused on traffic citations instead of criminal interdiction – was pretextual.**

Carnahan claims the PIP was to increase Hunter's enforcement (i.e. citations/warnings) in seatbelt, speed, and OWI offenses, so that he would become a "well-rounded trooper," and be disabused of the notion that he excelled in criminal interdiction. (PPFOF 98, 101.)

However, Carnahan knew it was simply a *typical pattern* for troopers who have lots of speed enforcement to have low criminal enforcement, while those with heavy criminal enforcement, who have a knack for getting guns and drugs off the highways and spend the necessary time to do this, tend to have lower speeding enforcement activity. (PPFOF 84.) While both types of enforcement are initiated with a traffic stop, it obviously takes much less time to write a warning or citation than to conduct a search and catalog evidence, apprehend and transport contraband, arrest and transport persons, write a detailed report for prosecution, etc. (*See* PPFOF 32, 38, 84, 119-120.) Carnahan knew that Hunter had a knack for criminal enforcement and hence was issuing relatively fewer seatbelt and speeding citations. (PPFOF 82-83.) But, this was not a legitimate reason to be placed on a PIP, let alone terminated.

Hunter's prior reviews were overwhelmingly positive with respect to Hunter's skill in criminal interdiction and encouraged him to focus on criminal interdiction. (PPFOF 94, for example: "Trooper Hunter you are one of the most active highway criminal interdiction troopers in the Southeast Region…you have developed an expertise in highway criminal interdiction and I would like you to continue to be active in the particular area.") *See Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 426-27 (7th Cir. 1992) ("defects" are pretextual when they were consistently accounted for

11

in previous performance evaluations, and yet the employee was retained for his ability to produce and his effectiveness in other areas.)

DOT DSP plays a vital role in criminal interdiction; troopers are sent to training throughout their careers to be able to spot indicators of criminal activity, and in the Trooper Position Description the top two duties are "enhancing public safety and combating crime and terrorism." (PPFOF 89-90.) Hunter's professional oath and code of ethics to the State of Wisconsin avers he will have "no compromise for crime and will [act] with relentless prosecution of criminals." (PPFOF 91.)

Between 2007 and 2014, Hunter had participated in various forms of criminal interdiction training through DOT, and consistently received positive supervisory feedback for his criminal interdiction skills, even if it meant relatively lower numbers of speeding tickets issued. (PPFOF 28, 86-87.) Hunter's relatively lower traffic enforcement was never used to downgrade his performance until *after* he filed a discrimination complaint. (PPFOF 88.) *See e.g. Mahmoud v. Bd. of Regents of the Univ. of Wisconsin Sys.*, No. 24-CV-384-JDP, 2026 WL 242087, *9 (W.D. Wis. Jan. 29, 2026) (a reasonable jury could reject the employer's assertion that Mahmoud was denied tenure for excessive absences where there was evidence that "Mahmoud's teaching and research were strong enough that 'perhaps his low service does not matter at all.'")

The PIP was solely a pretextual road to a discriminatory and retaliatory termination. It was not a legitimate concern that Hunter excelled in criminal interdiction – removing illegal guns and drugs from the highway - and therefore had less time to issue speeding citations. Trooper Henning had the highest criminal activity in the troop (one rank above Hunter) and the second lowest speed

12

enforcement (below Hunter).  (PPFOF 85.) Then, of course, there were troopers like Darin who had low criminal *and* low speed enforcement. (PPFOF 37.)  These other troopers would have been on their own PIPs if Carnahan had truly seen their discretionary (and largely skill-based) enforcement patterns as inappropriate.

### L.  The PIP was designed to attempt to generate information that could later be used to try to convince an Administrative Review Panel to terminate Hunter.

Carnahan designed the PIP such that it is nothing short of a miracle that Hunter succeeded (ultimately causing Carnahan to become desperate enough to simply falsify the underlying data to secure Hunter's termination, as shown below).

For example, Carnahan testified he tried to "help Hunter succeed" by secretly monitoring Hunter's computer to see if anything could be found that would constitute neglect of job duties. He found nothing concerning on Hunter's computer or email records.  (PPFOF 111.)

Carnahan instructed Hunter that he had to write more traffic tickets for the PIP, but also instructed Hunter to stay on the west side of the county, described by one trooper and Sgt. Guyton as a "ghost town,"  where there is less traffic and therefore less opportunity for enforcement. (PPFOF 106)

Hunter was instructed to issue more seatbelt tickets during the overnight shift.  The tint-meter is a tool that Hunter could use to recognize vehicles who are disguising their non-seatbelt usage through illegally tinted windows and pull them over.  (PPFOF 107.) Through Sgt. Guyton, Carnahan took away Hunter's tint meter, gave it to a different trooper, and instructed Guyton not to tell Hunter why. (PPFOF 108.)

13

Hunter was instructed both to complete his reports on the same shift or at the latest by the next shift, but he was also instructed that he had to be out making traffic stops during the last two hours of his shift. (PPFOF 109.) Hunter was instructed to *not* generally make traffic stops during his travel to and from his sector,[4] which took approximately one hour of his eight-hour shift, but he was still forced to log the time, not as travel, but as enforcement time, to create a situation where Hunter had to log in one hour of every shift as "enforcement" but was prohibited from engaging in any enforcement. (PPFOF 66.) This would obviously cause Hunter to have lower performance ratios, as his "enforcement hours" would be higher without concomitant enforcement. Moreover, this order would necessarily conflict with the directive to enforce for the last two hours of the shift – one half hour of which was the drive home.

And, when Hunter did *excellent* work, Carnahan would instruct Sgt. Guyton to focus on any arguable minor imperfection. For example, on May 25, 2018, a mere 17 minutes into his shift, Hunter exhibited really great police work in spotting an intoxicated driver with a small child in the vehicle, initiating a traffic stop, conducting a search resulting in the seizure of suspected heroin, processing the scene, arresting the driver, and getting the child into safe hands. (PPFOF 119.) Hunter's processing of that scene took the entire shift, and, at the end of the shift, after taking the driver to the hospital for a blood draw, Hunter had to take the blood to the post office to be sent to the crime lab. (PPFOF 120.) Carnahan instructed Sgt. Guyton to concentrate on the fact that Hunter did not use a post office in Waukesha to mail the blood (despite the fact that Hunter's shift required him to go to a 24-hour post office, which from Sgt. Guyton's supervisory standpoint, was

---

[4] All troopers start their shifts the moment they leave their driveways and start heading toward their sectors, and troopers are supposed to (and can even be disciplined for failing to) make enforcement stops as they drive to and from their sectors. (PPFOF 65.)

14

completely reasonable.) (PPFOF 121, *citing in part* Dkt. 23, ERD Tr. 449:5-450:4 (Sgt. Guyton testified: "Q. Yeah. And Carnahan instructs you on May 25th for this great enforcement action that was great cop work to keep these exchanges as examples of Hunter not making a good faith effort to maintain a positive and respectful relationship with supervision as well as intentionally deviating from work expectations, right? A. Yes.")

### M. Carnahan subjected Hunter to a draconian level of supervision and yet Hunter never had a work-rule violation throughout the PIP.

Carnahan personally monitored the routes Hunter, and only Hunter, was taking to and from work, including noting at which gas stations he was choosing to buy fuel, which is an unusual level of monitoring to which only Hunter was subjected. (PPFOF 67.)

In May of 2017, Carnahan decided to make Hunter keep his squad camera rolling throughout his entire shift for all shifts through termination. (PPFOF 112.) The only other trooper, ever, that may have been required to keep his squad camera rolling throughout his shift other than Hunter was a trooper who had received a plethora of citizen complaints, something that Hunter has never received. (PPFOF 113.)

Sgt. Guyton, at Carnahan's instruction, spent his work time watching Hunter's squad videos so as to know exactly what Hunter was doing at all times. (PPFOF 114.) Redundantly, Carnahan instructed Hunter to fill out daily logs of his activities in 15-minute brackets throughout his shift. (PPFOF 115.) Shortly thereafter, Carnahan dictated that Hunter's 15-minute logs only be completed in handwritten form, as opposed to electronically. (PPFOF 116.) Then, a main theme of the PIP became Hunter's "handwriting" being messy (PPFOF 117.) Hunter improved his handwriting upon request, making the logs easier for Guyton to read. (PPFOF 118.)

15

It is simply unheard of for an experienced trooper, outside of the probationary period, to be terminated for "poor performance." Generally only work-rule violations will lead to termination[5] of an experienced trooper like Hunter. (PPFOF 72.) Despite being under very intense monitoring throughout the PIP period, Hunter had no work-rule violations during this entire time.[6] (PPFOF 73.) Sgt. Guyton testified:

> Q. And Hunter was given the direction to record his entire shift when?
> A. June 7, 2017.
> Q. And that was through termination, right?
> A. Yes.
> Q. Okay. That's a long time. And he was required to turn in these videos to you in addition to the logs, right?
> A. Yes, ma'am.
> Q. And the supervisors would be able to determine what he was writing in his log and how he was spending his time was 100 percent accurate, right, because you had those videos?
> A. Yes.
> Q. And you would review Hunter's dash cam of his shifts?
> A. Yes.
> Q. And between the log system and the constant video surveillance, you would know what Hunter was doing 100 percent of the time, right?
> A. Yes.
> …

---

[5] It is rare, in fact, for a non-probationary trooper to be terminated even for work rule violations. (PPFOF 72.)

[6] This is not to say that Carnahan did not *try* to secure discipline for alleged work rule violations over the PIP period, but he was unsuccessful as his supervisors and HR would find there was insufficient evidence to support progressive discipline for any work rule violations, including insubordination. (PPFOF 75-76.) For example, Carnahan considered Hunter's complaints of discrimination and retaliation to constitute "insubordination." (PPFOF 77.) ER/HR recommended to Carnahan that if there was evidence of Hunter being insubordinate, it should be handled with progressive discipline as a work rule violation. (PPFOF 78.) For another example, Carnahan sought discipline for a Precision Immobilization Technique (PIT) maneuver that Hunter executed to stop a fleeing vehicle in January 2018, but Carnahan's supervisor declined to approve discipline, finding that the PIT had been very well done. (PPFOF 76.)

16

Q.   And during this entire time, enter PIP, FPIP, leading to termination, Hunter did not violate any work rules or policies, correct?

A.   Not that I am aware of.

(PPFOF 74.)

### N. Carnahan wildly misrepresented Hunter's true performance in the Administrative Review Packet to induce the Committee to take the unheard of step of terminating a trooper for not writing enough citations.

Following a Final PIP resulting in a termination recommendation, by policy, an Administrative Review Panel determines whether the facts *as presented in the "Administrative Review Summary Packet"* support termination, and if so, makes that recommendation to the administrator, who is the final authority. (PPFOF 43.) The Administrative Review Panel consists of personnel from the ranks of supervisors, HR staff, and the in-house attorney. (PPFOF 44.) The Panel relies solely on the information as presented in the Packet without verification, and there has never been an instance where the Panel's recommendation for termination has not been adopted. (PPFOF 44.)

**Defendant has never, other than Hunter, placed a Trooper on a Final PIP between 1994 and 2025.** (PPFOF 27.) **Other than Hunter, Defendant has never terminated a non-probationary Trooper solely for "poor performance," i.e. low or allegedly low enforcement activity.** (PPFOF 41.) The primary evidence used to support termination was enforcement data. (PPFOF 46.) The data in the Packet wildly misrepresented Hunter's true performance, alleging: "When comparing Trooper Hunter's enforcement activity to other midnight troopers in the Southeast Region, he had significantly fewer traffic stops, speed enforcement, and fewer restraint enforcement contacts." (PPFOF 47.) Carnahan portrayed Hunter as the **lowest performing midnight-shift trooper in his Troop**, and reported that while his "activity in some areas like speed and OWI enforcement has increased his activity still trails behind other similarly situated troopers."

17

(PPFOF 52.)  The *actual* enforcement data shows that **Hunter was at the middle of the troop in seatbelt and speeding enforcements, the second highest in OWI enforcement, and the second highest in criminal enforcement – in *no area* was he the lowest**. (PPFOF 37, 39.)

Carnahan reported in the Packet that the other midnight shift troopers had 1.65 to 5.76 times Hunter's traffic stops per shift, but DOT can identify *no other* midnight shift trooper that had even 3 times as many traffic stops as Hunter. (PPFOF 51.)  Carnahan reported in the packet that the other midnight shift troopers had 2.04 to 9.26 times Hunter's speed enforcements per shift, when the data showed that one other trooper had only one quarter Hunter's speed enforcements (Her), and the highest performing trooper in this area had only 2.8 times the number of Hunter's enforcements. (PPFOF 37, 50.)

The packet left the Committee to believe that Hunter was unsuccessful in his performance – that he could either not do the work or was refusing to, representing that Hunter made "no substantive changes to his work performance," to provide the false impression that Hunter is "capable of achieving the employer's reasonable goals and performance expectations. *He just refuses to.*" (PPFOF 48.) In reality, Hunter's performance had increased/improved across the board, and he was terminated despite being *a mid to top performing trooper in all measured areas.* (PPFOF 30, 37.)

**O.  All smilarly situated employees were treated more favorably because they did not have their lawful use of "officer discretion" curtailed by Carnahan despite at least half of them having had lower enforcement activity than Hunter.**

DOT compares troopers by enforcement actions per shift using troopers from the same shift, because midnight shift does not have as much traffic or visibility, etc., as first shift.  (PPFOF 34-35.)  The Southeast Region Midnight (i.e. third shift) Troopers working under Sgt. Guyton, Lt.

18

Rembert, and Captain Carnahan in 2018 were: Hunter (the only African American, and the only one who had filed an ERD/EEOC complaint asserting race discrimination), Kneisler, Darin, Thomspon, Morales, Mittelstadt, Moore, Magnusson, Henning, and Her. (PPFOF 7, 31.)

Defendant admits that those midnight shift troopers are similarly situated in every *relevant*[7] respect to Hunter, and at time of decision-making, the Employer used these troopers' data to compare Hunter "with his similarly situated peers in the SE region working the same overnight shift." (PPFOF 32-33.)

Hunter's performance in the six months leading to termination compared to his similarly situated peers working midnight shift is accurately depicted in the following charts and graphs, showing that Hunter (highlighted with red box) was a *top* performing trooper in some areas, a mid-performing trooper in other areas, and in *no* area was he a low performing trooper (PPFOF 37, 39):

---

[7] Differences between employees are irrelevant unless they present "confounding variables" that "make it unreasonable to infer that the two employees should have been treated the same way." *Mahmoud* at 10, *citing Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007); *see also Dunlevy v. Langfelder*, 52 F.4th 349, 353-54 (7th Cir. 2022), *quoting Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (similarly situated employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") "If a comparator engaged in equivalent or more egregious conduct than the plaintiff but received a lighter punishment, or none at all, that satisfies the inquiry." *Id.*, *citing Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005). Defendants may argue Hunter had more years of service than many of his comparators. There is nothing about years of service that could make, for example, searching a vehicle for drugs and then processing that evidence go significantly faster, or driving an OWI arrestee to jail and/or the hospital significantly faster, or responding to a highway crash scene go significantly faster, and there are no separate just cause standards for troopers based on years of service, such that years of service (beyond the probationary/non-probationary distinction) is meaningless. Trooper Kneisler had double the years of service Hunter did, and they had similar speed citations during the period leading up to Hunter's termination (with Hunter having slightly more), *and* Hunter also had 50 criminal enforcements during this same time period, compared to Kneisler's 30, despite the fact that criminal enforcements take much longer than writing a speeding ticket. (PPFOF 32, 38.) The Seventh Circuit has "repeatedly warned that courts should not draw the question of similarly situated too narrowly;" what is required is "similar enough to enable 'a meaningful comparison.'" *Dunlevy*, at 353-54, *quoting Coleman v. Donahoe*, 667 F.3d 835, 848 (7th Cir. 2012).

19

**All Activity (Citations and Warnings) Together**



**Criminal Interdiction**                                                              **Seatbelt Enforcement**



**OWI Enforcement**                                                                    **Speed Enforcement**



(PPFOF 37.)

20

None of the similarly situated troopers writing fewer citations and warnings per shift than Hunter (8.9), such as Moore (7.12), Thompson (6.99), Henning (6.4), Mittelstadt (4.64), Darin (4.25), or Her (2.29) were placed on a PIP or anything similar in an effort to increase their enforcement activity, let alone terminated. (PPFOF 40.) If "a plaintiff can show that other employees without relevant differences received better treatment than he did, that is enough to support a finding that the employer treated him less favorably because of the protected characteristic." *Mahmoud v. Bd. of Regents of the Univ. of Wisconsin Sys.*, No. 24-CV-384-JDP, 2026 WL 242087, at *10 (W.D. Wis. Jan. 29, 2026), *citing Prochaska v. Menard, Inc.*, 829 F. Supp. 2d 710, 720 (W.D. Wis. 2011), *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 708–09 (7th Cir. 2013). And, "only one similarly situated comparator," is necessary. *Id.* at 10, *quoting Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011).

**P. There is the rare "direct evidence" in this case that Hunter's race discrimination and retaliation complaints were the reason for his termination.**

The Administrative Review packet states, on page 10, that Hunter was terminated because he believed he had "retaliatory/discriminatory command staff." (PPFOF 45.) Carnahan testified he considered Hunter's complaints of discrimination and retaliation to constitute "insubordination." (PPFOF 77.) This is direct evidence of retaliation – a blatant admission that Defendant terminated Hunter because of his protected activity. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (direct evidence, though rarely found, is sufficient to meet the plaintiff's burden of showing the employer had unlawful animus).

21

**Q.** **It is inescabable that race was a factor, because Carnahan carefully funneled the negative employment actions through an African American supervisor, Sgt. Guyton, while simulationaulsy denying Sgt. Gutyon a vote in whether Hunter should be terminated, despite DOT's practice of always allowing White supervisors a vote.**

Carnahan used Sgt. Guyton to deliver the pretextual sanctions because Guyton was the same race as Hunter, showing beyond a doubt that race was *a* motivation. The very first month of the PIP, Sgt. Guyton praised Hunter for responding to management's feedback, getting good enforcement numbers, and told Hunter that he was doing exactly what he should be and to keep it up. (PPFOF 102.) Yet, unbeknownst to Sgt. Guyton[8], this angered Carnahan, prompting Carnahan to gripe to the lieutenant, "If his aim is to make you and me look like the bad guys, [Guyton] is doing a superb job." (PPFOF 103.)

Sgt. Guyton was specifically instructed by Carnahan to add negative information to Guyton's reports about Hunter – for example, getting him to write that "Hunter is not taking ownership of his obligations" and that Hunter was "unprofessional" for having scuffs in his leather belt and a corroded badge. (PPFOF 70.) It was not even Hunter's responsibility to supply himself with these items; DSP provides the duty belt and badges to troopers; instead of writing Hunter up for his badge and belt showing his decade of service, DSP could have, but did not, simply replace these items. (PPFOF 71.)

This continued throughout the PIP. For example, on May 26, 2018, Sgt. Guyton sent an email to Carnahan and the lieutenant reporting that he had conducted a ride along with Hunter and everything went well. (PPFOF 122.) Carnahan instead wanted Sgt. Guyton to "capture" or generate

---

[8] It was unknown by Guyton *until* Plaintiff's counsel showed Guyton the email at the ERD hearing.

22

instances of Hunter's alleged bad attitude. (PPFOF 123.) Hence, on the very next ride along report three days later, in an attempt to appease Carnahan to the point of absurdity, Sgt. Guyton wrote that Hunter was "passively aggressively" trying to avoid picking up Guyton for a ride along by (a) being on an active traffic stop when Guyton called for pick up, and then (b) being forced to intervene to arrest a drunk driver spotted by Hunter's partner as Hunter was on his way to pick Guyton up. (PPFOF 124.)

Similarly, in the *audio recording* of the June, 2018, monthly PIP meeting, Sgt. Guyton informed Hunter that he was progressing in the right direction and staying active out there; however, *management's written summary* represents: "Hunter is not giving the performance program an opportunity to work." (PPFOF 125.)

In August of 2018, Hunter had clicked the wrong county on a computer menu, a small human error which Sgt. Guyton simply prompted Hunter to fix. Hunter promptly did, responding, "My bad. Done." (PPFOF 126.) Carnahan and the lieutenant instructed Sgt. Guyton to "use this piece of information" in his report writing on Hunter. (PPFOF 127.)

Despite using Sgt. Guyton as a Black supervisor through which to funnel pretextual nitpicking, DOT denied Sgt. Guyton the typical decision-making power it routinely affords White sergeants. For example, Sgt. Guyton did not want to prejudge Hunter by presuming, prior to the end of the full PIP period, that he would fail , but unbeknownst to Sgt. Guyton, Carnahan was emailing ER/HR informing it that Hunter's PIP performance was predicted to be unsatisfactory – weeks before Sgt. Guyton was even ready to start judging Hunter's performance. (PPFOF 128-130.) Sgt. Guyton did not pre-judge whether Hunter should be terminated prior to the Final PIP ending

23

on August 28, 2018; however, someone other than Guyton instructed ER/HR Ms. Winkler, on July 31, 2018, to make Hunter's Administrative Review a "top priority." (PPFOF 131.) As early as August 2, 2018, Carnahan and HR, unbeknownst to Sgt. Guyton, were already drafting the Administrative Review Summary, meaning the termination was foreordained, as there is no reason to assemble it if the employee successfully completes the FPIP. (PPFOF 132.)

Most shockingly, while White first-line supervisors are routinely given a vote as to whether a direct subordinate should be terminated (PPFOF 11), here, Sgt. Guyton was *not* given a vote and was not a decisionmaker in Hunter's August, 2018, termination, despite it having been funneled through him. (PPFOF 12; *see also* Farrell Dec., Ex. 85.) Sgt. Guyton's notations from the month of Hunter's termination were that it would have been his recommendation to *keep* Trooper Hunter remaining on the program, not to terminate him. (PPFOF 13.) *See e.g. Mahmoud v. Bd. of Regents of the Univ. of Wisconsin Sys.*, No. 24-CV-384-JDP, 2026 WL 242087, at *9 (W.D. Wis. Jan. 29, 2026) (finding that denying one of plaintiff's supporters the ability to vote was evidence of discrimination.)

Carnahan testified under oath (more than once) that Sgt. Guyton was the person who collected the "data" used to support Hunter's negative reviews and termination, and that Carnahan had no part in collecting it. (PPFOF 56.) This was untrue. Almost immediately after Hunter's ERD case was filed, as early as September of 2014, Carnahan started collecting Hunter's data through the lieutenant, *without including Sgt. Guyton*, trying to catch Hunter having low levels of enforcement activity during shifts. (PPFOF 80.) Carnahan represented Hunter's performance in the Administrative Review packet (Farrell Dec., Ex. 85), under *Sgt. Guyton's name*, as follows:

> During this FPIP evaluation period, Trooper Hunter was assigned to the Waukesha County working almost exclusively the midnight shift… For the emphasis areas, his efforts were:

24

> • Restraint enforcement ............... 0.17 enforcement actions per shift
> • Speed enforcement .................... 0.689 enforcement actions per shift
> • Impaired driving enforcement ... 0.207 enforcement actions per shift (3 per month)
>
> This means that with regard to speed and restraint enforcement action, **he averaged less than one enforcement contact in either category per shift**. Trooper Hunter had no additional assignments such as fleet safety officer, recruiter, training instructor or court officer. Trooper Hunter's efforts in self-initiated stops, speed enforcement and safety restraint enforcement were low for a trooper with his experience, knowledge, training and years of service.

(PPFOF 49 (emphasis in original.) This was extremely misleading because these numbers are average or above average, and when Hunter's counsel showed Sgt. Gutyon Hunter's *actual* numbers, he testified truthfully on behalf of Defendant:

Q. So I want to draw your attention to this sentence right below these bullet points-
A. Okay.
Q. - that's in bold and italics, right?
A. Uh-huh.
Q. And it says, "This means that with regard to speed and restraint enforcement action, he averaged less than one enforcement contact in either category per shift," right?
A. Yes.
Q. And that, if you are presenting it to a bunch of HR staff that don't know jack about being a trooper, that might seem kind of shocking, right?
A. That's possible.
…
Q. Okay. In reality, every single one of your southeast troopers working the midnight shift is averaging less than .25 OWIs per shift, right?
A. Okay.
Q. Every single one?
A. Yes.
Q. And every single one of your southeast troopers is averaging less than .72 - .72 or less enforcement actions in seat belts per shift, right?
A. Yes.
Q. …All right. Speed per shift…You have three troopers that are getting between one and two speeds per shift?
A. Okay.
Q. Right? But every – all of the other ones are getting fewer, right?
A. Yes.
Q. So these numbers are just, like, normal and average, right?
A. Compared to that, yes.
Q. Yeah. Did you – I want to draw your attention to Page 8 where this says traffic stops during the FPIP, Trooper Hunter made an average of 2.41 traffic stops per

25

> shift…Other troopers had between 1.65 and 5.76 times the number of stops as did Trooper Hunter, right?
>
> A.   Yes.
>
> Q.   Did you write that?
>
> A.   No.
>
> Q.   No. Did you write this one about speed enforcement that has the same kind of analysis?
>
> A.   No.
>
> Q.   Did you write this one about the restraint enforcement at the bottom of Page 8 with the same kind of analysis?
>
> A.   No.
>
> …
>
> Q.   If you had realized that these numbers were wildly misrepresented, would you have talked to supervision about that?
>
> A.   Yes.
>
> Q.   And would you have talked to HR about that?
>
> A.   Yes.

(PPFOF 57.)

## R. DOT-DSP's failure to follow its own procedure for handling Hunter's discrimination complaints further demonstrates that retaliation was the true motivation.

During the PIP, Hunter explained, respectfully, to Sgt. Guyton that he kept increasing his numbers as management had asked but it was never enough, and "we all know what this is." (PPFOF 141.) Hunter documented that he felt retaliation and discrimination were the barriers to his meeting his PIP goals at least three times over the summer of 2018, on his PIP monthly performance reviews. (PPFOF 142.) Yet, DOT-DSP did not follow its *own* procedures in handling Hunter's claims of discrimimantory and retaliatory conduct. Lt. Rembert testified:

> Q.   So is it that Hunter was alleging retaliatory and discriminatory actions by command staff, and then you decided, well, he's lying, so I'm not going to send it to HR or any proper channels to be investigated?
>
> A.   That would be correct because– I was personally there. I didn't see any of that.
>
> Q.   And is that your understanding of what the Department of Transportation normal business procedure is, if an employee claims that they're fearing retaliation and

discrimination, the supervisor can just say, "Huh, I don't believe it" and not pass it up for review?

A.      No, no, that's not normal practice.

(PPFOF 143.) Defendant's Employee Relations (ER/HR) Specialist, Ms. Winkler, attempted to

deny it, but the truth is DOT *did not ever* "look into" Hunter's complaints. (PPFOF 144-145.)

Employee Relations Specialist, Ms. Winkler, testified:

Q.      …. Did you look into Hunter's written allegation that his command staff was retaliating against him; yes or no?

A.      Yes.

…

Q.      Are you testifying that you believe you asked [Carnahan and Guyton] what could a potential basis for retatialion be?

A.      Correct.

Q.      And neither of them told you, well, there was a discrimination complaint that Hunter lodged against us and we were all interviewed in 2015 about that?

A.      I don't recall that coming up.

Q.      Is that something you would expect them to disclose to you if you asked them in your formal capacity?

A.      Yeah.

Q.      Yes?

A.      Yeah.

Q.      So when you asked command staff that was involved with the FPIP what could possibly he be talking about that we're retaliating against him for, when they said, "we can't think of anything," did that sort of end your investigation there?

A.      Yea, pretty much. I mean, there was nothing else I could go off of.

…

Q.      So did you alert AAEEO and/or Brenda Brewer that, "Hey, one of…the troopers in the Division of State Patrol is making an allegation of retaliation"?

A.      Normally I would, but I don't know if I did in this case. I don't remember. I'm not saying I didn't. I just don't recall.

(PPFOF 146.) While DOT ER/HR claims there was "nothing else" to go off of, it never

interviewed Hunter. (PPFOF 145.)

27

### S. Additional evidence of pretext

While Carnahan's misrepresentations about Hunter's enforcement-per-shift data were the basis for terminating Hunter, it is worth noting that Administrative Packet is padded with additional pretext. For example, it alleged Hunter exhibited a bad attitude and dismissed the supervisor's concern that Hunter had issued a warning, instead of a ticket, to a construction zone speeder. (PPFOF 60.) However, the *audio recording* of that meeting depicts nothing that could be fairly categorized as insubordinate, dismissive, or rude to command staff or anything along those lines, but rather a reasonable use of officer discretion. (https://www.youtube.com/shorts/9UJAlNsS_34 PPFOF 61; *see also* PPFOF 62-63.)

The packet alleged that Hunter was consistently not enforcing during the last two hours of his shift as command staff requested, while the audio recording of that meeting depicts Sgt. Guyton informing Hunter, "I'm seeing that you're starting to make traffic stops toward the end of your shift. I want you to continue to do that. I think that's a great thing." (PPFOF 64.)

The packet represented that though Hunter's reports were well written and professional, he was reviewing his videos in detail while writing his reports to ensure they were fully accurate, which the employer complained was a time-wasting practice. (PPFOF 68.) However, DOT policy has *required* since January of 2018, Troopers to review video while writing a report as it is best practice. (PPFOF 69.)

### T. In *defense* of the unlawful termination of Hunter, even more lies were told.

Carnahan *falsely* testified at that Arbitration hearing that one of Hunter's performance problems was that the District Attorney had sent emails to Carnahan complaining that Hunter was

28

not getting reports, citations, and evidence submitted in a timely manner (there are no such emails). (PPFOF 133.) "When evidence indicates an attempt to justify a discharge after the fact, it can suggest a discriminatory motive." *Mahmoud*, at 9, *citing Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 882 (7th Cir. 2016).

Carnahan also testified *falsely* at the arbitration hearing to the effect that Hunter had never informed management that the numbers they were generating for Hunter's enforcement during the FPIP meetings seemed to be incorrect. There are emails showing otherwise. (PPFOF 137-139.) In fact, Lt. Rembert had followed up and learned Hunter had almost three times the enforcement numbers that had been reported in the management meeting, but he cannot recall having done anything with that information. (PPFOF 140.)

And, DOT *falsely* claimed to the Arbitrator through testimony and the statement of DOT's authorized attorney representative that Carnahan and Guyton were unaware of Hunter's ERD activity and therefore could not possibly have been acting in retaliation for the same, which Defendant does not now contend it had any good faith basis to make:

> [Hunter] argues that Mr. Hunter's placement on his Final Performance Improvement Plan and his ultimate termination were a result of retaliation for a discrimination complaint that was filed. This is unfounded. The Sergeant and other management testified credibly that they had no knowledge of this discrimination complaint and one cannot retaliate against someone when they have no knowledge of the complaint.

(PPFOF 135-136.) Sgt. Guyton and Captain Carnahan knew in *2014* that Hunter had named them as the supervisors who he felt were discriminating against him. (PPFOF 134.)

29

**U. The record as a whole would not allow any reasonble jury to believe DOT's termination of Hunter was legitmate, as the record as a whole has eliminated *any* reason to terminate Hunter other than discrimnation and retaliation.**

The Defendant has already admitted, through its Administrative Review Panel, that Hunter was terminated *solely* for poor performance in the form of not meeting his PIP goals of *increasing* enforcement in speeding, seatbelts, and OWI. (PPFOF 54-55, 58.) Not only is this pretextual, as Hunter did *increase* these metrics across the board, but the lieutenant on the termination committee admitted it really did not matter what Hunter's performance was – he was going to be terminated, period:

> Q. And do you see that despite working fewer hours every year, he has increased his traffic stops every year, like he was directed to on this performance improvement program?
> A. I see that.
> Q. And that he has increased his speeding enforcement every year despite having fewer hours on duty to complete those enforcement actions? Do you see that?
> A. I see that.
> Q. And he's got more – he's increased across the board, right? He's increased his seatbelt citations, he's increased his OWI citations, and he's almost even increased all of his criminal arrests, as well, right?
> A. Correct.
> …
> Q. If you had been presented this data that we see in Exhibit 49 at the termination hearing for Hunter, would you still have voted to terminate him?
> A. I would have, yes.
> Q. Even though he's increasing across the board in every area that he was instructed to?
> A. Yes.

(PPFOF 59.) In conclusion, because no reasonable jury could return a verdict for the Defendant on the undisputed factual record as a whole, summary judgment should be granted to plaintiff, leaving only the issue of damages for trial.

Dated this Wednesday, April 15, 2026.

Respectfully submitted,

30

Tavaris Hunter,

Plaintiff,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
ANDREA J. FARRELL
State Bar Number 1064773
1025 Quinn Dr., Suite 500
Waunakee, WI 53597-2502
Phone          608/283-6001
Fax            608/283-0945
Email:         jsolson@scofflaw.com
               ajf@scofflaw.com

/s/ Andrea J. Farrell

_____

Andrea J. Farrell
ATTORNEY FOR PLAINTIFFS

31