# United States District Court

## Eastern District of Wisconsin

Tavaris Hunter,

       Plaintiff,

                                    Case No.  25cv70

   v.

Department of Transportation,

       Defendant.

---

### Plaintiff's LR 56 Proposed Findings of Fact

---

**Introductory Background**

1. Hunter is an African American Trooper with Black skin who litigated a race discrimination complaint against Defendant (his employer) between 2014 and 2016; Tavaris Hunter v. State of Wisconsin, ERD Case No. CR201402577, EEOC Case No. 26G201401270C.  (Dkt. 22, ERD Tr., 70:11-71:6, Farrell Dec., ¶ 2.)

2. On August 30, 2018, Hunter was terminated (which Hunter appealed internally to Arbitration and complained was discriminatory and retaliatory

1

in an ERD complaint, and the ultimate motivation for which is now the underlying issue before the Court). (Farrell Dec., Ex. A, No. 1; Ex. B.)

3. In September, 2019, the Arbitrator found Hunter's termination had not been supported by just cause and ordered Defendant to reinstate Trooper Hunter. (Farrell Dec., Ex. A, No. 1; Ex. B.)

4. Defendant DOT DSP's Superintendent Tim Carnahan was Captain (aka Regional Commander) of the SE Region between 2011 and February 2018. (Dkt. 22; ERD Tr. 23:15-20.)

5. As Captain (aka Regional Commander), Carnahan was the direct supervisor of lieutenants (including the lieutenant of Plaintiff Hunter's Region/Troop). Each lieutenant supervised seven sergeants, who each supervised a troop of approximately eight Troopers, like Hunter, or Inspectors (who specialize in commercial motor vehicle inspections). (Dkt. 22, Tr. 23:20-24:20.)

6. Hunter is the only Trooper under Carnahan's supervision who is known to have filed an ERD/EEOC complaint asserting race discrimination. (Farrell Dec., Ex. C, No. 4.)

7. Hunter was the only African American Trooper in his Troop. (Dkt. 22, Tr. 171:18-172:12.)

8. Between October, 2013, and Hunter's termination in August, 2018, Hunter's Troop's first level supervisor was Sgt. Guyton, the second level supervisor

2

was the lieutenant, and the third level supervisor was Captain Carnahan. (Dkt. 22, Tr. 24:5-24, 85:1-8.)

9. Sgt. Guyton is Black/African American.  (Dkt. 24, Tr. 561:23-24.)

10. Sgt. Guyton believed that Hunter has great cop instincts and writes great police reports.  (Dkt. 23, ERD Tr. 416:17-23.) (

11. White first-line supervisors are routinely given a vote as to whether a direct subordinate should be terminated.  (Dkt. 25. ERD Tr. 869:2-14, 917:18-22; Farrell Dec., Ex. C, No. 32.)

12. Sgt. Guyton was *not* given a vote, was not a decisionmaker in Hunter's August 2018 termination, and rather, Guyton testified, he was "not sitting at the table saying yea, nay;" it was up to Carnahan and the "upper echelon of the State Patrol." (Dkt. 24, ERD Tr. 564:5-21, "Q. Were you a decision maker for the termination of Trooper Hunter from his position? A. No. Q. Who was? A. I would say upper command. Q. And that would be who? A. I would say the captain, maybe the  lieutenant. Q. You are talking about - A. Oh, Captain Carnahan at the time. Q. Okay. A. If I am in the mistaken possibly Lt. -- I want to say my lieutenant at the time was Rembert, but it was also the superintendent which I think -  I am not sure who the name. It's been so long but the lieutenant, so it was just the upper echelon of  the State Patrol;" *see also* ERD Tr. 566:23-568:8; Farrell Dec., Ex. C, No. 33.)

3

13. Sgt. Guyton's notations from the month of Hunter's Termination were that it would have been his recommendation to keep Trooper Hunter remaining on the program. (Dkt. 23, ERD Tr. 567:11-15.)

14. As a trooper, prior to filing an ERD/EEOC complaint, Hunter consistently met expectations in every one of his quarterly and annual performance evaluations between his hire in 2007, and March 31, 2014. (Farrell Dec., Ex. C, No. 5; Farrell Dec., Ex. A, No. 1; Ex. B; Dkt. 22, ERD Tr., 45:16-47:25.)

15. On Hunter's performance review in early 2014, Sgt. Guyton scored Hunter as exceeding expectations in communications and diversity, meeting expectations in all other areas, and complimenting Hunter on his diverse traffic enforcement and his excellent criminal interdiction skills and encouraging him to apply for additional criminal assignments and training opportunities.  (Dkt. 23, ERD Tr. 410:1-412:9.)

16. As is typical of the Captain's position, Carnahan had no input into Hunter's "meets expectations" reviews in 2012-2014, prior to the ERD complaint being filed.  (Dkt. 22, ERD Tr., 105:9-24.)

17. In August 2014, Hunter filed race discrimination complaints, both internally and with the ERD, after Hunter was encouraged to apply for criminal interdiction positions by his then supervisors, but believed upon application he had been passed over for less qualified white troopers.  (Dkt. 24, ERD Tr., 569:4-571:24; Farrell Dec., ¶ 2, Ex. A, No. 1; Ex. B.)

4

18. Following the DOT's own internal investigation in August 2015, Affirmative Action Officer Maya Rudd found no evidence of a hostile work environment, but that "there were inconsistencies in 2014 which you may feel could support your allegations" as to the criminal interdiction hiring. (Dkt. 24, ERD Tr. 569:4-571:19; Dkt. 22, Tr. 76:1-20.)

19. Hunter's March, 2015, performance evaluation was, for the first time, "Needs Improvement," and for the first time, atypically, negative comments were directly inserted into Hunter's performance review by Captain Carnahan. (Farrell Dec., Ex. A, No. 1; Ex. B; Farrell Dec., Ex. C, No. 12.)

20. It is atypical for the Captain to be involved in drafting performance reviews of troopers, because even if a sergeant truly had shortcomings, the lieutenant would have accommodated the sergeant's shortcomings, not the Captain. (Farrell Dec., Ex. C, No. 11; Dkt. 22, ERD Tr. 100:15-104:7; Dkt. 24, ERD Tr. 795:10-20, 803:5-7.)

21. Carnahan testified that the reason he drafted some of Trooper Hunter's performance reviews beginning in 2015, was because Sgt. Guyton had "no pride," "no knowledge" or "foresight," did not come from the trooper-side of law enforcement, and he did not have a lot of background or experience, and Guyton had an inability to write well. (Farrell Dec., Ex. D, No. 17; Dkt. 22, Tr. 83:22-84:20; Dkt. 23; Dkt. 24, Tr. 691:3-5; 752:21-23.)

5

22. Defendant cannot identify a single other trooper performance review Captain Carnahan drafted portions of to accommodate Sgt. Guyton's alleged deficiency, nor was Guyton ever placed on a PIP or anything similar for alleged poor performance as a supervisor. (Farrell Dec., Ex. D, No. 17; Dkt. 22, ERD Tr. 83:22-84:20; Dkt. 23, ERD Tr. 438:23-439:1, 454:2-10; Dkt. 24, ERD Tr. 691:3-5; 752:21-23.)

23. After the ERD granted probable cause and while the ERD action was in the discovery phase in the spring of 2016, Sgt. Guyton drafted Hunter's performance review and scored Hunter, "Meets Expectations." (Farrell Dec., Ex. C, No. 16; *see also* Farrell Dec., Ex. A, No. 1; Ex. B.)

24. After the ERD complaint was settled and dismissed in June 2016, Carnahan again drafted the negative portions of Hunter's performance evaluation; Hunter's March, 2017, review was "Needs Improvement," and was the worst review Hunter received. (Dkt. 22, ERD Tr. 112:24-113:22; Dkt. 23, ERD Tr. 503:3-22, 505:24-506:7; Farrell Dec., Ex. A, No. 1; Ex. B; Farrell Dec., Ex. C, No. 17.)

25. In the March, 2017, review, Guyton – Hunter's actual direct supervisor - wrote about the excellent police work Hunter had accomplished throughout the year, like saving a person from a burning vehicle and arresting two robbers who were wanted for a string of gas station robberies across the area. (Dkt. 23, ERD Tr. 503:23-504:14.)

26. Based on the two "needs improvement" reviews of March 2015 and March 2017, in April, 2017, Hunter was placed on a PIP through February 2018, and scored "Unsatisfactory," leading to a Final PIP (FPIP) between February and August 2018. (Farrell Dec., Ex. A, No. 1; Ex. B; Dkt. 22, ERD Tr. 118:16-120:1; Farrell Dec., Ex. C, No. 19.)

27. Defendant has never, other than Hunter, placed a Trooper on a Final PIP between 1994 and 2025. (Farrell Dec., Ex. D, No. 14; *see also* Dkt. 25, ERD Tr. 903:22-904:19; Dkt. 22, ERD Tr. 131:24-122:8.)

28. Hunter's evaluations upon returning to work due to the Arbitration Award, conducted by Sgt. Matthew Noah, were all "Meets Expectations," noting that Hunter's OWI/seatbelt/speed "numbers are acceptable though on the low-end of troop averages. **This is balanced by significant arrests for drugs and firearms with thorough investigations**." (Farrell Dec., Ex. A, No. 1; Ex. B; Ex. F (emphasis added).)

**Hunter's Performance at the Time of Termination**

29. Hunter was instructed that his primary goal in his PIP was to "increase" his enforcement in the areas of speed, seatbelt use, and OWIs. (Dkt. 22, ERD Tr. 134:3-135:1.)

30. Hunter steadily increased his enforcement activity, especially in speed and seatbelt enforcement, as Defendant requested between 2016 and 2018,

7

between being placed on the PIP and being terminated, as shown on the

following graphs:





(Farrell Dec., Ex. D, No. 12; *see also* Dkt. 23, ERD Tr. 532:12-24, 533:6-25.) (PPFOF 30.)

31. The Southeast Region Midnight (i.e. third shift) Troopers working under Sgt. Guyton, Lt. Rembert, and Captain Carnahan, in 2018, were Troopers Hunter (the only African American, and the only one who had filed an ERD/EEOC complaint asserting race discrimination), Kneisler, Darin, Thomspon, Morales, Mittelstadt, Moore, Magnusson, Henning, and Her. (Farrell Dec., Ex. C, No. 2-4; Dkt. 22, ERD Tr. 171:18-172:12.)

32. Hunter's enforcement data during the six months leading to termination compared to similarly situated midnight shift Troopers, were as follows:

### February 28 through August 28, 2018

| | Shifts Worked | Traffic Stops | T.S. Per Shift | Speed Enf.* | A OWI Enf. | B Restraint Enf. | C Total A, B, C | D Criminal eSP4500 | E Non-Crim. eSP4500 | Total D & E | F Total Citations | G Total Warnings | Total F & G | DSP Years |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hunter | 86 | 230 | 2.674 | 64 | 19 | 16 | 99 | 50 | 25 | 75 | 222 | 543 | 765 | 11.5 |
| Kneisler | 111 | 490 | 4.414 | 129 | 20 | 80 | 229 | 30 | 42 | 72 | 298 | 1023 | 1321 | 19 |
| Darin | 108 | 310 | 2.870 | 118 | 13 | 15 | 146 | 16 | 31 | 47 | 97 | 362 | 459 | 2 |
| Thomson | 107 | 461 | 4.308 | 210 | 18 | 33 | 261 | 25 | 54 | 79 | 269 | 478 | 747 | 2.5 |
| Morales | 83 | 380 | 4.578 | 249 | 6 | 57 | 312 | 33 | 57 | 90 | 263 | 547 | 810 | 2.5 |
| Mittelstadt | 89 | 263 | 2.955 | 138 | 5 | 47 | 190 | 16 | 25 | 41 | 188 | 225 | 413 | 2.5 |
| Moore | 113 | 542 | 4.796 | 395 | 5 | 14 | 414 | 44 | 56 | 100 | 211 | 593 | 804 | 2 |
| Magnusson | 109 | 475 | 4.358 | 218 | 9 | 19 | 246 | 38 | 58 | 96 | 267 | 762 | 1029 | 2.5 |
| Henning | 99 | 302 | 3.051 | 52 | 20 | 68 | 140 | 66 | 108 | 174 | 150 | 484 | 634 | 2 |
| Her | 56 | 68 | 1.214 | 18 | 14 | 3 | 35 | 20 | 37 | 57 | 60 | 68 | 128 | 4 |

*Does not include unreasonable/imprudent speed violations (s.345.57(2). See gray column below.

Probationary employee

| | Shifts Worked | Speed Enf.* | A OWI Enf. | B Restraint Enf. | C Total A, B, C | A, B, C Per Shift | Unreas./ Imprudent |
|---|---|---|---|---|---|---|---|
| Hunter | 86 | 64 | 19 | 16 | 99 | 1.151 | 43 |
| Kneisler | 111 | 129 | 20 | 80 | 229 | 2.063 | 1 |
| Darin | 108 | 118 | 13 | 15 | 146 | 1.352 | 1 |
| Thomson | 107 | 210 | 18 | 33 | 261 | 2.439 | 8 |
| Morales | 83 | 249 | 6 | 57 | 312 | 3.759 | 0 |
| Mittelstadt | 89 | 138 | 5 | 47 | 190 | 2.135 | 2 |
| Moore | 113 | 395 | 5 | 14 | 414 | 3.664 | 0 |
| Magnusson | 109 | 218 | 9 | 19 | 246 | 2.257 | 1 |
| Henning | 99 | 52 | 20 | 68 | 140 | 1.414 | 2 |
| Her | 56 | 18 | 14 | 3 | 35 | 0.625 | 0 |



EXHIBIT Carnahan 14

9

(Farrell Dec., Ex. D., No. 4.)

33. Defendant admits that those midnight shift troopers listed in the table above are similarly situated in every respect to Hunter, with the sole difference being based on years of service *but without any contention that years of service subjected the troopers to different standards*, (Farrell Dec., Ex. D, No. 1), and that at time of decisionmaking, the data from these midnight shift troopers was used to compare Hunter "with his similarly situated peers in the SE region working the same overnight shift." (Dkt. 22, ERD, Tr. 177:13-18.)

34. The employer typically compares troopers by shift, because it would be concerning to see Hunter compared to a first shifter due to different opportunities, constraints, traffic patterns, etc., between day and night. (Dkt. 22, ERD Tr. 120:22-121:2, Dkt. 24, ERD Tr. 635:1-6.)

35. It is also important, when looking at a trooper's enforcement metrics, to take into account the number of shifts the trooper worked. (Dkt. 25, ERD Tr. 859:15-860:1.)

36. Because of the PIP, Hunter was required to have bi-weekly meetings with his supervisors at Headquarters, which would take time away from his enforcement activities. (Dkt. 22, ERD Tr. 142:1-10.)

37. Hunter's performance in the six months leading to termination compared to his similarly situated peers working midnight shift is accurately depicted in the following charts and graphs:

10

**All Activity (Citations and Warnings) Together**

| | Shifts | Cites/Warns | Citations and warnings p/s |
|---|---|---|---|
| Kneisler | 111 | 1321 | 11.9 |
| Morales | 83 | 810 | 9.76 |
| Magnussor | 109 | 1029 | 9.44 |
| Hunter | 86 | 765 | 8.9 |
| Moore | 113 | 804 | 7.12 |
| Thompson | 107 | 747 | 6.99 |
| Henning | 99 | 634 | 6.4 |
| Mittelstadt | 89 | 413 | 4.64 |
| Darin | 108 | 459 | 4.25 |
| Her | 56 | 128 | 2.29 |



11

## Criminal Enforcement

| | Shifts | Criminal | Criminal p/s |
|---|---|---|---|
| Henning | 99 | 66 | 0.67 |
| Hunter | 86 | 50 | 0.58 |
| Morales | 83 | 33 | 0.4 |
| Moore | 113 | 44 | 0.39 |
| Her | 56 | 20 | 0.36 |
| Magnussor | 109 | 38 | 0.35 |
| Kneisler | 111 | 30 | 0.27 |
| Thompson | 107 | 25 | 0.23 |
| Mittelstadt | 89 | 16 | 0.18 |
| Darin | 108 | 16 | 0.15 |

### Criminals per shift

| | |
|---|---|
| Henning | 0.67 |
| Hunter | 0.58 |
| Morales | 0.4 |
| Moore | 0.39 |
| Her | 0.36 |
| Magnusson | 0.35 |
| Kneisler | 0.27 |
| Thompson | 0.23 |
| Mittelstadt | 0.18 |
| Darin | 0.15 |

12

## OWI Enforcement



| | Shifts | OWI | OWIs p/s |
|---|---|---|---|
| Her | 56 | 14 | 0.25 |
| Hunter | 86 | 19 | 0.22 |
| Henning | 99 | 20 | 0.2 |
| Kneisler | 111 | 20 | 0.18 |
| Thompson | 107 | 18 | 0.17 |
| Darin | 108 | 13 | 0.12 |
| Magnussor | 109 | 9 | 0.08 |
| Morales | 83 | 6 | 0.07 |
| Mittelstadt | 89 | 5 | 0.06 |
| Moore | 113 | 5 | 0.04 |

EXHIBIT



OWIs Per Shift Feb 28 - Aug 28, 2018

| | |
|---|---|
| Her | 0.25 |
| Hunter | 0.22 |
| Henning | 0.2 |
| Kneisler | 0.18 |
| Thompson | 0.17 |
| Darin | 0.12 |
| Magnusson | 0.08 |
| Morales | 0.07 |
| Mittelstadt | 0.06 |
| Moore | 0.04 |

13

**Seatbelts**

| | | | |
|---|---|---|---|
| Kneisler | 111 | 80 | 0.72 |
| Morales | 83 | 57 | 0.69 |
| Henning | 99 | 68 | 0.69 |
| Mittelstadt | 89 | 47 | 0.53 |
| Thompson | 107 | 33 | 0.31 |
| Hunter | 86 | 16 | 0.19 |
| Magnussor | 109 | 19 | 0.17 |
| Darin | 108 | 15 | 0.14 |
| Moore | 113 | 14 | 0.11 |
| Her | 56 | 3 | 0.05 |



**Speed**



(Farrell Dec., Ex. D, No. 5-9; Dkt. 22, ERD Tr. 174:10-20; 177:13-18.)

38. Hunter and Kneisler, midnight shifters in the same troop, had similar speed citations during the period leading up to Hunter's termination (with Hunter having slightly more), *and* Hunter also had 50 criminal enforcements during this same time period, compared to Kneisler's 30, despite the fact that criminal enforcements take much longer than writing a speeding ticket. (Dkt. 22, ERD Tr. 170:7-171:10.)

39. The Defendant's enforcement data shows that Hunter, during the FPIP period, was at the middle of the troop in seatbelt enforcements, writing more citations than 4 and fewer than 5 of his peers; the second highest in OWI enforcement, with only one other trooper making more OWI arrests than

15

Hunter; the second highest in criminal enforcement, and the middle of the pack for speeding citations. (Dkt. 22, ERD Tr. 174:10-177:10.) (PPFOF 39.)

40. None of the similarly situated Troopers writing fewer citations and warnings per shift than Hunter (8.9), such as Moore (7.12), Thompson (6.99), Henning (6.4), Mittelstadt (4.64), Darin (4.25), or Her (2.29) were placed on a PIP or similar in any effort to increase their enforcement activity. (Farrell Dec., Ex. D, No. 10.)

41. Other than Hunter, Defendant has never terminated a non-probationary Trooper solely for "poor performance," i.e. low or allegedly low enforcement activity. (Farrell Dec., Ex. C, No. 36; Farrell Dec., Ex. D, No. 11.)

**Termination Decisionmaking Process**

42. Carnahan testified he "wouldn't characterize" himself as a decisionmaker in Hunter's termination; rather, he made a recommendation and it was up to the "Administrative Review" panel. (Dkt. 22, Tr. 187:9-16.)

43. Following a Final PIP resulting in a termination recommendation, by policy, an Administrative Review Panel determines if the facts as presented in the Administrative Review Summary packet support termination, and if so, makes that recommendation to the administrator, who is the final authority. (Farrell Dec., Ex. C., No. 37.)

44. The Administrative Review Panel consists of personnel from the ranks of supervisors (J.D. Lind, Chuck Teasdale, Nakia Guyton, Cedric Rembert, Tim Carnahan, Steve Krueger, Tim Huibregste), HR staff (Randy Sarver/Brenda Brewer, Netty Winkler/Megan Reichel), and the in-house attorney (Dan Graff), and relies solely on the information as presented in the packet without verification, and there has never been an instance where the Panel's recommendation for termination has not been adopted. (Farrell Dec., Ex. D, No. 2; Farrell Dec., Ex. 13; Dkt. 25 ERD Tr. 918:21-919:25, 921:2-11; Dkt. 22, ERD Tr. 187:17-189:1.) NOTE: While Guyton was "on" the Panel, he was denied a vote. *See* PPFOF 12.)

45. The Administrative Review packet states on page 10 – Hunter was terminated because he believed he had "retaliatory/discriminatory command staff." (Farrell Dec., Ex. 85, p. 10.)

46. The primary evidence the Employer used to support termination was enforcement data. (Dkt. 25, ERD Tr. 861:1-9.)

47. The data that was used to make a case for Hunter's termination was inaccurate and wildly misrepresented his true performance. (Dkt. 24, ERD Tr. 664:20-665:23; Dkt. 19, Carnahan Dep Tr. 121:11-134:24; 137:21-144:14, "When comparing Trooper Hunter's enforcement activity to other midnight troopers in the Southeast Region, he had significantly fewer traffic stops, speed

17

enforcement, and fewer restraint enforcement contacts." *c.f.* actual

performance data above in PPFOF 37.)

48. This left the Committee to believe that Hunter was unsuccessful in his

performance – that he could either not do the work or was refusing to. (Dkt.

25, ERD Tr. 893:8-896:15, 946:23-947:3; Farrell Dec., Ex. 85, p. 19, representing

that Hunter made "no substantive changes to his work performance" despite

the PIP and FPIP, to provide the false impression that Hunter is "capable of

achieving the employer's reasonable goals and performance expectations. *He*

*just refuses to*.")

49. Carnahan represented Hunter's performance in the Administrative Review

packet as follows:

During this FPIP evaluation period, Trooper Hunter was assigned to the
Waukesha County working almost exclusively the midnight shift. Trooper
Hunter 210 self-initiated stops with 509 warnings and 212 citations during
this period. This translates to an average of 2.41 traffic stops, 5.85 warnings
and 2.43 citations per shift. He made 18 operating under the influence arrests
and issued 15 safety restraint and 60 speed enforcement actions during this
period. For the emphasis areas, his efforts were:

• Restraint enforcement ............... 0.17 enforcement actions per shift

• Speed enforcement .................... 0.689 enforcement actions per shift

• Impaired driving enforcement ... 0.207 enforcement actions per shift (3 per
month)

This means that with regard to speed and restraint enforcement action, *he*
*averaged less than one enforcement contact in either category per shift*.
Trooper Hunter had no additional assignments such as fleet safety officer,
recruiter, training instructor or court officer. Trooper Hunter's efforts in self-
initiated stops, speed enforcement and safety restraint enforcement were low
for a trooper with his experience, knowledge, training and years of service.

18

(Farrell Dec., Ex. C, No. 29; Farrell Dec., Ex. 85.)

50. Carnahan reported in the Administrative Review packet that the other midnight shift troopers had 2.04 to 9.26 times Hunter's .689 speed enforcements per shift. (Farrell Dec., Ex. C, No. 40.) (*c.f.* graph above in PPFOF 37 – other Troopers had only one quarter of Hunter's speed enforcement (Her), and the highest performing trooper in this area had only 2.8 times the number of Hunter's enforcement.)

51. Carnahan drafted the portion of the Administrative Review Summary termination packet claiming that the other midnight shift troopers had 1.65 to 5.76 times Hunter's 2.41 traffic stops per shift, but Defendant can identify *no other* midnight shift trooper that had even 3 times as many traffic stops as Hunter – none had *near* 5.76. (Farrell Dec., Ex. D, No. 16.)

52. In the Administrative Review packet, Carnahan portrayed Hunter as the lowest performing midnight-shift trooper in his Troop, and that while his "activity in some areas like speed and OWI enforcement has increased his activity still trails behind other similarly situated troopers." (Farrell Dec., Ex. C, No. 38.) (*c.f.* graphs above – Hunter was the second highest performer in OWIs, and *trailed* behind *no one*.)

53. The Defendants' enforcement data from 2018 showed that of the southeast region midnight-shift troopers, Hunter was not the lowest performing trooper in any measured enforcement areas. (Farrell Dec., Ex. C, No. 39.)

54. Allegations that Hunter had a bad attitude or a bad response toward supervisory staff were not relied on in the termination decision. (Dkt. 25, ERD Tr. 953:1-12, "Q. Was one of the reasons that you understood Trooper Hunter to be terminated for like a bad attitude or a bad response towards supervisory staff? A. No. That really didn't go into it. I think that when you get to the point of an FPIP, you know, you're going to see some behavior that's a little bit off. You know, people are upset. And so as far as I was concerned, it rested solely on the data and the information that was given."; *see also* Dkt. 25, ERD Tr. 860:23-861:9 ("Q I want to talk to you about your testimony that Hunter -- I think you called him defiant? A Uh-huh. Q And I think you basically talked about him having a bad attitude? A Correct. Q Was that a factor in the decision to terminate Hunter? A No. The factor was based on performance. Q Performance numbers? A Performance overall and also not meeting the goals and expectations. Q Can you tell me anything more specifically than that? A I don't remember."; *see also* 899:13-16, 900:18-19.)

55. According to Lt. Rembert of the Administrative Review Panel, Hunter was terminated solely for messy handwriting and poor performance through lack of minimum activity:

Q But I'm going to ask you: Were there other issues brought up -- other important issues brought up, or was handwriting the only issue?

A Handwriting was one of the issues. Performance was another issue that was addressed during those meetings where the employee didn't have any activity or show lack of activity or minimum activity where the employee was

20

counseled about improving his performance. And that's pretty much what I can remember.

(Dkt. 25, ERD Tr. 838:3-12.)

56. Carnahan testified under oath (more than once) that Sgt. Guyton was the person who collected the "data" used to support Hunter's negative reviews and termination, and that Carnahan had no part in collecting it. (Dkt. 22, ERD Tr. 80:6-82:18; Farrell Dec., Ex. C, No. 30.)

57. Sgt. Gutyon testified truthfully on behalf of Defendant, upon reviewing the Administrative Packet – that has his name on top:

**Administrative Review Summary**
**Employee: Trooper Tavaris J. Hunter**
**Date: August 24, 2018**
**Supervisor: Sgt. Nakia Guyton**

(Farrell Dec., Ex. 85):

Q. So I want to draw your attention to this sentence right below these bullet points-

A. Okay.

Q. - that's in bold and italics, right?

A. Uh-huh.

Q. And it says, "This means that with regard to speed and restraint enforcement action, he averaged less than one enforcement contact in either category per shift, right?

A. Yes.

Q. And that, if you are presenting it to a bunch of HR staff that don't know jack about being a trooper, that might seem kind of shocking, right?

A. That's possible.

…

Q. Okay. In reality, every single one of your southeast troopers working the midnight shift is averaging less than .25 OWIs per shift, right?

A. Okay.

Q. Every single one?

A. Yes.

Q. And every single one of your southeast troopers is averaging less than .72 - .72 or less enforcement actions in seat belts per shift, right?

A. Yes.

Q. …All right. Speed per shift…You have three troopers that are getting between one and two speeds per shift?

A. Okay.

Q. Right? But every – all of the other ones are getting fewer, right?

A. Yes.

Q. So these numbers are just, like, normal and average, right?

A. Compared to that, yes.

Q. Yeah. Did you – I want to draw your attention to Page 8 where this says traffic stops during the FPIP, Trooper Hunter made an average of 2.41 traffic stops per shift…Other troopers had between 1.65 and 5.76 times the number of stops as did Trooper Hunter, right?

A. Yes.

Q. Did you write that?

A. No.

Q. No. Did you write this one about speed enforcement that has the same kind of analysis?

A. No.

Q. Did you write this one about the restraint enforcement at the bottom of Page 8 with the same kind of analysis?

A. No.

…

22

Q. If you had realized that these numbers were wildly misrepresented, would you have talked to supervision about that?

A. Yes.

Q. And would you have talked to HR about that?

A. Yes.

(Farrell Dec., Ex. C, No. 31; Dkt. 24, ERD Tr. 662:17-664:19; 665:15-21; Farrell Dec., Ex. A, No. 5.)

58. Hunter was terminated solely for [allegedly] not meeting his PIP goals of *increasing* enforcement in speeding, seatbelts, and OWI. (Dkt. 25, Tr. at 861:1-9; Farrell Dec., Ex. C, No. 35.)

59. At the ERD hearing, Lt. Rembert was shown the actual performance data and testified:

Q. And do you see that despite working fewer hours every year, he has increased his traffic stops every year, like he was directed to on this performance improvement program?

A. I see that.

Q. And that he has increased his speeding enforcement every year despite having fewer hours on duty to complete those enforcement actions? Do you see that?

A. I see that.

Q. And he's got more – he's increased across the board, right? He's increased his seatbelt citations, he's increased his OWI citations, and he's almost even increased all of his criminal arrests, as well, right?

A. Correct.

Q. And he's increased his traffic stops between 2016 and 2018 like he was instructed to do, right?

A.  Correct.

Q.  If you had been presented this data that we see in Exhibit 49 at the termination hearing for Hunter, would you still have voted to terminate him?

A.  I would have, yes.

Q.  Even though he's increasing across the board in every area that he was instructed to?

A.  Yes.

(Farrell Dec., Ex. C, No. 49; Dkt. 25, Tr. 886:15-887:15.)

**Secondary Issues Stated in Support of Hunter's Termination**

60. The Administrative Review Summary gave an example of Hunter's alleged bad attitude towards supervisory concerns, leading the Panel to believe Hunter dismissed the supervisor's concern that Hunter had issued a warning instead of a ticket to a construction zone speeder.  (Dkt. 25, ERD Tr. 953:20-954:11.)

61. However, the *audio recording* of that meeting depicts nothing that could be fairly categorized as insubordinate, dismissive, or rude to command staff or anything along those lines, but rather a reasonable use of officer discretion. (Dkt. 25, ERD Tr. 954:12-955:10; Farrell Dec., https://www.youtube.com/shorts/9UJAlNsS_34 .)

62. The Administrative Review packet alleges that Hunter "became defensive" when supervision tried to address an "unsafe" search of a vehicle without a

24

backup officer present; however, the audio recording of that conversation portrays Lt. Rembert telling Hunter he did not do anything wrong on that search, period. (Farrell Dec., Ex. C, No. 41-42; Dkt. 25, ERD Tr. 860:23-868:23.)

63. Lt. Rembert knew that the Administrative Packet represented the conversation about that vehicle search as an example of Hunter's defiant and bad attitude, and he even testified falsely at the hearing that the Administrative Packet was accurate – until confronted with the actual *audio* recording of that meeting:

Q Did you tell Hunter during one of these final performance improvement plan meetings in front of Sergeant Guyton and the union and God and all that there is nothing wrong with that period; Hunter didn't do anything wrong period?

A I did not.

Q You didn't say that?

A No.

Q Okay. And so you didn't correct this under No. 6 when it claims that Hunter did something wrong; right?

A Because the sergeant wrote that.

Q The sergeant wrote that, okay. And you didn't say, "Hey, but I talked to Hunter and I told Hunter he didn't do anything wrong because that didn't happen"; right?

A I never talked to Hunter.

Q And then the second part where it says that "when this was addressed with him, he became defensive and was resistant to change," is this intended to be an example of his bad attitude?

A That's correct.

Q And you didn't make any corrections to that; right? You're saying you believe that to be true?

A That's correct.

Q And this write-up is taking place on or around August 15th, 2018, two weeks before termination; right?

A That's correct.

Q It's already been stipulated at a previous hearing that I have the recordings from the final performance improvement plan meetings, and I'm going to be playing you the August 2nd, 2018, recording from minute 4 and 27 seconds to minute 6 and 50 seconds. And I just want you to listen. And then I'm going to ask you some questions about it; okay?

(Portion of audio played)

…

Q Okay. Was that your voice I heard on that recording?

A Yes.

Q And did you discuss in this August 2nd formal FPIP meeting that was recorded with the union present, with Sergeant Guyton present and with Trooper Hunter present, that Trooper Hunter did search a vehicle without a backup officer; right?

A Correct.

Q And you did hear yourself telling Trooper Hunter, "You didn't do anything wrong on that, period"; right?

A That's correct.

Q And it's my perception of listening to that, you know, two-minute clip is that Trooper Hunter was pretty calm and respectful. Would you agree with that?

A His tone was a little bit abrasive but not out of control.

…

Q And is that one piece of the overall collective that you chose to terminate Trooper Hunter for?

A No.

Q No. So if I can have you take a look, please, at Exhibit 85?

…

Q So if you're at Exhibit 85, if you could please turn to page 16. Do you see the first paragraph under the bold 6?

26

A Yes.

…

Q Yes. This document is the administrative review summary for employee Hunter which supports his termination; right?

A That's correct.

Q Do you see included in this document that one of the reasons is that allegedly Hunter did something wrong by searching this vehicle?

A I see that.

Q And is it also alleged in here that Hunter became defensive and basically had a bad attitude in response to that being brought up? Do you see that?

A I do.

Q And you did have a vote at the final meeting where this document was reviewed and it was chosen to terminate Hunter; right?

A That's correct.

Q Did you voice up during that meeting like, "I'm concerned about this document that we're relying on, this is not a good reason to terminate someone, I actually told him he didn't do anything wrong, and his attitude was pretty good"?

A I did not.

Q Why not?

A Because my vote was based on the overall performance of that time period, the final performance improvement plan.

Q Not so much asking about your vote, but you knew there were people from HR voting; right?

A That's correct.

Q And those people from HR are not familiar with Trooper Hunter on an individual level at all and probably don't even know what it takes to be a trooper, if we're being honest; right?

A Correct.

Q And you knew that they were going to be relying on the words in this document for their vote; right?

A That's correct.

Q And yet you still didn't let them know, "Hey, this part at least of this document is a little bit incorrect"?

A I did not.

(Dkt. 25, ERD Tr. 861:22-862:17, and *quoting* 862:18-867:19.)

64. The Administrative Review packet alleged that Hunter was consistently not enforcing during the last two hours of his shift as command staff requested; while the audio recording of that meeting depicts Sgt. Guyton informing Hunter, "I'm seeing that you're starting to make traffic stops toward the end of your shift. I want you to continue to do that. I think that's a great thing." (Farrell Dec., Ex. C, No. 43-44; *see also* Dkt. 23, ERD Tr. 474:1-15, Farrell Dec., Ex. 85, p. 9.)

65. All troopers start their shifts the moment they leave their driveways and start heading toward their sectors, and troopers are supposed to (and can even be disciplined for failing to) make enforcement stops as they drive to and from their sectors. (Dkt. 22, ERD Tr. 146:17-147:15, Dkt. 24, ERD Tr. 762:7-17.)

66. Hunter was instructed to *not* generally make traffic stops during his travel to and from his sector, which took approximately one hour of his eight-hour shift, but he was still forced to log the time, not as travel, but as enforcement time, to create a situation where Hunter had to log in one hour of every shift as "enforcement" but was prohibited from engaging in any enforcement. (Dkt. 22, ERD Tr. 152:9-153:6; Dkt. 23, ERD Tr. 514:23-516:9.)

28

67. Carnahan personally monitored the routes Hunter, and only Hunter, was taking to and from work, including noting at which gas stations he was choosing to buy fuel, which is an unusual level of monitoring to which only Hunter was subjected. (Dkt. 22, ERD Tr. 145:10-146:16; Dkt. 25, ERD Tr. 811:11-812:5.)

68. The Administrative Review packet represented that though Hunter's reports were well written and professional, he was reviewing his videos in detail while writing his reports to ensure they were fully accurate, which the employer complained was a time-wasting practice. (Farrell Dec., Ex. 85, p. 7, Dkt. 24, ERD Tr. 582:3-583:13.)

69. However, DOT policy has *required* since January of 2018, Troopers to review video while writing a report as it is best practice. (Dkt. 22, ERD Tr. 299:2-25; Dkt 23, ERD Tr. 421:19-423:3.)

70. Sgt. Guyton was specifically instructed by Carnahan and the lieutenant to add negative information to Guyton's reports about Hunter – specifically asking Guyton to write that "Hunter is not taking ownership of his obligations" and specifically ordered Guyton to write that Hunter was "unprofessional" for having scuffs in his leather belt and a corroded badge. (Dkt. 23, ERD Tr. 456:7-24.)

71. However, it was not Hunter's responsibility to supply himself with these items; DSP provides the duty belt and badges to troopers; instead of writing

29

Hunter up for his badge and belt showing his decade of service, DSP could have, but did not, simply replace these items. (Dkt. 23, ERD Tr. 456:20-457:20, 529:10-23.)

**Hunter's Lack of Work Rule Violations**

72. It is unheard of for an experienced trooper, outside of the probationary period, to be terminated for "poor performance," and generally only work-rule violations will lead to termination[1] of an experienced trooper like Hunter. (Farrell Dec., Ex. C, No. 28; Dkt. 22, ERD Tr. 300:1-301:2; 325:15-326:6.)

73. Despite being under very intense monitoring throughout the PIP period, Hunter had no work violations during this entire time. (Dkt. 22, ERD Tr. 154:3-11; Dkt. 23, ERD Tr. 528:14-529:17.)

74. Sgt. Guyton testified:

Q. And Hunter was given the direction to record his entire shift when?

A. June 7, 2017.

Q. And that was through termination, right?

---

[1] It is rare, in fact, for a non-probationary trooper to be terminated even for work rule violations. (Dkt. 22, ERD Tr. 301:2-9.)

A. Yes.

Q. Okay. That's a long time. And he was required to turn in these videos to you in addition to the logs, right?

A. Yes, ma'am.

Q. And the supervisors would be able to determine what he was writing in his log and how he was spending his time was 100 percent accurate, right, because you had those videos?

A. Yes.

Q. And you would review Hunter's dash cam of his shifts?

A. Yes.

Q. And between the log system and the constant video surveillance, you would know what Hunter was doing 100 percent of the time, right?

A. Yes.

Q. And that if there was something unaccounted for in the written log, you could look at the video, vice versa?

A. Yes.

Q. And during this entire time, enter PIP, FPIP, leading to termination, Hunter did not violate any work rules or policies, correct?

A. Not that I am aware of.

(Dkt. 23, Tr. 528:14-529:17.)

75. Carnahan pushed for some discipline for work rule violations over the PIP period (which required approval of supervisors and HR), but HR would review and decline to agree that there was sufficient evidence to support

31

progressive discipline for any work rule violations, including

insubordination.  (Dkt. 22, ERD Tr. 154:12-157:11, 162:5-17.)

76. For example, Carnahan sought discipline for a PIT maneuver[2] that Hunter

executed to stop a fleeing vehicle in January 2018, but Carnahan's supervisor

declined to approve discipline, finding that the PIT had been very well done.

(Dkt. 22, ERD Tr. 160:20-162:4, 282:21-283:7; *see also* Dkt. 24, ERD Tr. 756:13-

757:4, Dkt. 25, ERD Tr. 850:16-851:12.)

77. Carnahan considered Hunter's complaints of discrimination and retaliation to

constitute "insubordination."  (Farrell Dec., Ex. C, No. 25; Dkt. 22, Tr. 165:2-8.)

78. ER/HR recommended to Carnahan that if there was evidence of Hunter

being insubordinate, it should be handled with progressive discipline as a

work rule violation.  (Dkt. 25, Tr. 935:1-936:13.)

**The PIP Leading to Termination**

79. In the normal course of business, the first line supervisor, here Sgt. Guyton,

would be responsible for conducting the Final PIP, but in this case, Carnahan

set the FPIP parameters. (Dkt. 23, ERD Tr. 510:1-13.)

---

[2] "The PIT maneuver (precision immobilization technique, also known as TVI (tactical vehicle intervention or tactical vehicle interception), is a law enforcement pursuit tactic in which a pursuing vehicle suddenly laterally strikes the side-rear of the pursued vehicle, thus causing the pursued vehicle to swing around and come to an unplanned stop. Ideally, forces of motion cause the struck vehicle to "pinwheel" around its own center axis and wind up facing the opposite direction of travel." https://en.wikipedia.org/wiki/PIT_maneuver

32

80. Almost immediately after the ERD case was filed, as early as September of 2014, Carnahan started collecting Hunter's data through the lieutenant, *without including Sgt. Guyton*, trying to catch Hunter having low levels of enforcement activity during shifts, even noting in writing that he **hoped** the stops Hunter made over his recent shifts occurred only when Sgt. Guyton was riding along with Hunter.  (Dkt. 22, ERD Tr., 85:19-89:21.)

81. Note: Carnahan now claims that he was collecting this data for the purpose of responding to Hunter's first ERD complaint, but he previously testified he did not know of Hunter's ERD complaint at that time.  (Dkt. 19, Carnahan Dep Tr. 181:6-8, Q And you were aware of Hunter's August 2014 ERD complaint shortly after it was filed; right? A No, I don't believe that's the case;"  182:2-10, Q Okay. Are you saying that you didn't know, in let's say September of 2014, the month after Trooper Hunter filed his Equal Rights Division complaint, that Trooper Hunter was filing -- had filed an Equal Rights Division complaint regarding, in part, not being promoted to some air force group or a K9 group that you had talked about with Mr. Fish? A Yes.")

82. Carnahan could plainly see from the data he collected that Hunter had about three times as many criminal arrests as his midnight shift counterpart, double the average criminal arrests of the troop altogether; more other citations than his midnight shift counterpart, and double the troop average altogether; more than double the alcohol enforcement as his counterpart, and almost double

33

the troop average altogether; and that he had four consent searches compared to his counterpart's zero consent searches. (Dkt. 19, Carnahan Dep., Tr. 195:19-197:2.)

83. On the other hand, Hunter had only five OWI's compared to his counterpart's eight; zero seatbelt tickets compared to his counterpart's fifteen. (Dkt. 19, Carnahan Dep Tr. 197:3-20.)

84. Carnahan knew it was simply a *typical pattern* for troopers who have lots of speed enforcement to have low criminal enforcement, while those with heavy criminal enforcement, who have a knack for getting guns and drugs off the highways and spend the necessary time to do this, tend to have low speeding enforcement activity. (Dkt. 22, ERD Tr. 178:24-179:24.)

85. For example, Trooper Henning had the highest criminal activity in the troop (one rank above Hunter) and the second lowest speed enforcement (below Hunter). (Dkt. 22, ERD Tr. 179:1-25.)

86. Between 2007 and 2014, Hunter had participated in various forms of criminal interdiction training through DOT, and criminal interdiction work on duty, and consistently received positive supervisory feedback for this. (Dkt. 24, ERD Tr. 572:8-573:2.)

87. While his speeding and seatbelt citations were relatively low, he more than made up for this with his skills in criminal interdiction. (Dkt. 24, ERD Tr. 793:7-794:24.)

88. Hunter's low traffic enforcement was never used to downgrade his performance until *after* he filed an ERD complaint. (Dkt. 23, ERD Tr. 428:1-7.)

89. Defendant plays a vital role in criminal interdiction, as Wisconsin's highways, such as those that run through Waukesha County, are a huge corridor for drug trafficking, so Troopers are sent to training throughout their careers to be able to spot indicators of criminal activity. (Dkt. 24, ERD Tr. 812:9-813:7.)

90. Pursuant to the Trooper Position Description, criminal enforcement is a major duty of a Trooper, as Defendant's two top goals are enhancing public safety and combating crime and terrorism. (Dkt. 22, ERD Tr. 32:4-33:17, 36:4-37:11.)

91. Hunter has a professional oath and code of ethics and has sworn to the State of Wisconsin that he will have "no compromise for crime and will [act] with relentless prosecution of criminals," and that he, "alone" is "responsible for [his] own standard of professional performance." (Dkt. 24, ERD Tr. 556:14-558:1.)

92. Troopers are afforded a great deal of professional discretion in enforcing the laws, as is cemented in the trooper position description and the Wisconsin oath of officers. (Dkt. 23, ERD Tr. 398:6-400:7.)

93. Compassion to the community is one of DSP's official goals, and troopers are instructed to show compassion to violators, especially those that appear to be facing hardship. (Dkt. 23, ERD Tr. 400:8-19.)

94. Hunter's prior reviews were overwhelmingly positive with respect to Hunter's skill in criminal interdiction and encouraged him to focus on criminal interdiction. For example, Hunter's direct supervisors wrote in Hunter's performance reviews:

> Tavaris, you have demonstrated a passion for criminal interdiction and you have great skills and abilities in this type of enforcement. You have made many criminal arrests this past year, and you have removed many dangerous people from the highways.
>
> …
>
> During this evaluation period you have been active in highway criminal interdiction. Trooper Hunter you are one of the most active highway criminal interdiction troopers in the Southeast Region. Trooper Hunter you have developed an expertise in highway criminal interdiction and I would like you to continue to be active in the particular area.
>
> …
>
> You have a unique ability to seek out and identify those motorists committing criminal acts. You use legal methods that you developed through training and experience to search vehicles for contraband. Your efforts have been very successful and have led to several felony drug and weapons arrests.
>
> …

36

> You have been very aggressive in highway criminal interdiction and you have made several high-profile felony level arrests.
>
> …
>
> You have developed skills to quickly identify those individuals who are being untruthful and you utilize legal methods to identify suspicious behavior.

(Dkt. 22, ERD Tr. 45:16-47:25, 47:20- 50:4, 55:9-21, 61:1-62:8; Farrell Dec., Ex.

2 and 3.)

95. It was Carnahan's understanding that there were two routes to terminating a trooper – discipline-based or performance-based. (Dkt. 22, ERD Tr. 96:11-14.) (PPFOF 95.)

96. Carnahan did not have the independent ability to authorize discipline at that time. HR would have needed to approve, and the seven just-cause factors would have needed to be satisfied. (Dkt. 22, ERD Tr. 96:15-97:7.) (PPFOF 96.)

97. Carnahan testified that he knew he could terminate a trooper under the "guise" of "performance" through the use of Performance Improvement Plans (PIP) without HR approval. (Dkt. 22, ERD Tr. 97:8-98:22; Dkt. 19, Carnahan Dep. Tr. 112:1-8.)

37

98. Carnahan, knowing that Hunter had a proven track record in criminal interdiction, attempted to disabuse Hunter of the notion that Hunter was tearing it up out there in criminal interdiction and told Hunter that his primary duties on the PIP were to be writing speeding, seatbelt, and OWI citations. (Dkt. 22, ERD Tr. 70:7-10, 136:22-137:5.)

99. Carnahan testified that to start the PIP, he sat Hunter down with a binder explaining the very, very basics of how to be a trooper, despite the fact that Hunter had been an accomplished trooper for a decade already. (Dkt. 22, ERD Tr. 135:6-136:7.)

100. Carnahan testified he created the binder so that eventually he'd be able to testify that he went through this information with Hunter in great detail. (Dkt. 22, ERD Tr. 136:8-14.)

101. Carnahan placed Hunter on a PIP on April 1, 2017, without HR's knowledge, allegedly to increase Hunter's enforcement (i.e. citations/warnings) in in seatbelt, speed, and OWI offenses, to become a "well-rounded trooper." (Dkt. 22, ERD Tr. 118:16 120:1; Farrell Dec., Ex. C, No. 19.)

102. In April of 2017, Sgt. Guyton truthfully told Hunter that Hunter had responded to the feedback about getting good enforcement numbers in Waukesha and that Hunter was doing exactly what he should be, and to keep it up. (Dkt. 23, ERD. Tr. 439:5-20.)

103. Yet, unbeknownst to Sgt. Guyton, this angered Carnahan, prompting Carnahan to gripe to the lieutenant, "If his aim is to make you and me look like the bad guys, Nakia [Guyton] is doing a superb job." (Dkt. 23, Tr. 439:21-440:11.)

104. In the regular course of business, Employee Relations/HR would be involved in the placement of a trooper on a PIP so as to help guide management through the process, but ER/HR did not learn Hunter was on a PIP until he had been on it for eight months. (Dkt. 25, ERD Tr. 930:15-933:23.)

105. In 2018, the DOT-DSP did not support quotas, such that it would not require a Trooper to have a certain *number* of traffic stops or citations per shift, or a certain *range* of enforcement activity that management would find acceptable, in part because the Wisconsin legislature made it illegal to give quotas to law enforcement officers. (Farrell Dec., Ex. C, No. 1.)

106. Carnahan instructed Hunter that he had to write more traffic tickets for the PIP, but also instructed Hunter to stay on the west side of the county where there is less traffic and less opportunity for enforcement. (Dkt. 22, ERD Tr. 137:12-138:4; 306:20-307:2 (Trooper Kneisler testified the west side of the

39

county is a "ghost town" over the 10 midnight shift, and not where you would want to be if you were trying to increase traffic citations); Dkt. 23, ERD Tr. 513:10-20 (Sgt. Guyton testified, "Q. Okay. And, for example, the overarching goal as we have covered was for Hunter to make more traffic stops throughout his shift, especially for speed, seatbelt, and OWI, right? A. Yes. Q. But he was also instructed to spend more time on the west side of the sector? A. Yes. Q. Which is like a ghost town in the middle of night? A. Yes."; Farrell Dec., Ex. C, No. 23.)

107.    Carnahan knew that prosecution for tinted windows was not really possible without a tint meter and that heavily tinted windows keep troopers from being able to see if the occupants are violating seatbelt laws. (Dkt. 22, ERD Tr. 151:4-13, *see also* Dkt. 23, ERD Tr. 514:4-22, Sgt. Guyton knew that it was impossible to see if an occupant was wearing their seatbelt if they had illegal tinted windows, and without a tint meter, Hunter would have a hard time sustaining any enforcement action on tinted windows, which could only serve to lower the number of citations he could write.)

108. By and through Sgt. Guyton, Carnahan took away Hunter's tint meter, gave it to a different trooper, and instructed Guyton not to tell Hunter why. (Dkt. 22, ERD Tr. 147:16-148:18; Dkt. 23, ERD Tr. 511:18-25; Farrell Dec., Ex. 26.)

109. Hunter was instructed both to complete his reports on the same shift or at the latest by the next shift, but he was also instructed that he had to be out making traffic stops during the last two hours of his shift, meaning that if Hunter made traffic stops in the middle of his shift, he would be forced to either violate the directive to get his reports done during that same shift, or violate the directive to be out making traffic stops during the last two hours of his shift. (Dkt. 23, ERD Tr. 516:10-517:9.)

110. Hunter was the only trooper held to such a short timeline for reports. (Dkt. 23, ERD Tr. 517:10-518:3.)

111. Carnahan testified he tried to "help Hunter succeed" by personally, and through HR or IT staff, secretly monitoring Hunter's computer to see if anything could be found that would constitute neglect of job duties (there was nothing concerning on Hunter's computer or email records). (Dkt. 22, ERD Tr. 142:11-145:9; Farrell Dec., Ex. C, No. 18.)

112. As part of Hunter's PIP, in May of 2017, Carnahan decided to make Hunter keep his squad camera rolling throughout his entire shift for all shifts between June 7, 2017, and August 30, 2018. (Farrell Dec., Ex. C, No. 20.)

41

113. The only other trooper, ever, that may have been required to keep his squad camera rolling throughout his shift other than Hunter was a trooper who had received a plethora of citizen complaints, something that Hunter has never received. (Dkt. 22, ERD Tr. 138:5-139:13, Dkt. 23, ERD Tr. 527:21-528:22.)

114. Sgt. Guyton, at Carnahan's instruction, spent his work time watching Hunter's squad videos so as to know exactly what Hunter was doing at all times. (Dkt. 23, ERD Tr. 528:14-529:17; Farrell Dec., Ex. C, No. 21.)

115. Redundantly, Carnahan instructed Hunter to fill out daily logs of his activities in 15-minute brackets throughout his shift. (Farrell Dec., Ex. C, No. 22.)

116. In May of 2017, Carnahan dictated that Hunter's 15-minute logs only be completed in handwritten form, as opposed to electronically. (Dkt. 22, ERD Tr. 140:5-21.)

117. Then, a main theme of the PIP became Hunter's "handwriting" being messy. (Dkt. 25, ERD Tr. 837:19-838:12.)

118. Hunter improved his handwriting upon request, making the logs easier for Guyton to read. (Dkt. 23, ERD Tr. 474:1-15.)

119. In May of 2018, 17 minutes into his shift, Hunter exhibited really great police work in spotting an intoxicated driver with a small child in the vehicle, instantiating a traffic stop, conducting a search resulting in the apprehension

42

of suspected heroin, processing the scene, arresting the woman, and getting the child into safe hands. (Dkt. 23, ERD Tr. 443:8-446:13; 637:1-640:8.)

120. Hunter's processing of that scene took the entire shift, and at the end of the shift, after taking the driver to the hospital for a blood draw, Hunter had to take the blood to the post office to be sent to the crime lab. (Dkt. 23, ERD Tr. 448:4-20.)

121. Carnahan instructed Guyton to concentrate on the fact that Hunter did not use a post office in Waukesha (despite the fact that Hunter's shift required him to go to a 24-hour post office, which from Sgt. Guyton's supervisory standpoint, was completely reasonable.) (Dkt. 23, ERD Tr. 448:21-449:16; *see also* Tr. 449:5-450:4 (Sgt. Guyton testified: Q. Yeah. And Carnahan instructs you on May 25th for this great enforcement action that was great cop work to keep these exchanges as examples of Hunter not making a good faith effort to maintain a positive and respectful relationship with supervision as well as intentionally deviating from work expectations, right? A. Yes.")

122. On May 26, 2018, Sgt. Guyton sent an email to Carnahan and the lieutenant reporting that he had conducted a ride along with Hunter and everything went well. (Dkt. 22, ERD Tr. 165:18-166:10.)

123. Carnahan instead wanted Sgt. Guyton to "capture" or generate instances of Hunter's alleged bad attitude. (Dkt. 22, ERD Tr. 165:9-17.)

43

124. On the very next ride along report three days later, Sgt. Guyton wrote that Hunter was "passively aggressively" trying to avoid picking up Guyton for a ride along by (a) being on an active traffic stop when Guyton sent the message to be picked up for a ride along, and then (b) being forced to intervene to arrest a drunk driver spotted by Hunter's partner as Hunter was on his way to pick Guyton up for a ride-along. (Dkt. 22, ERD Tr. 166:17-168:4.)

125. In the audio recording of the June, 2018, FPIP meeting, Sgt. Guyton informed Hunter that he was progressing in the right direction and staying active out there; however, management's written summary represents: "Hunter is not giving the performance program an opportunity to work." (Farrell Dec., Ex. C, No. 47-48; Dkt. 23, ERD Tr. 479:5-21.)

126. In August of 2018, Hunter had clicked the wrong county on a computer menu, which is just a small human error, and Sgt. Guyton simply asked Hunter to fix it, which Hunter promptly did, responding, "My bad. Done." (Dkt. 23, ERD Tr. 440:21-442:9.)

127. But, despite this being a minor human error that was easily corrected and had been corrected, Carnahan and the lieutenant instructed Sgt. Guyton to "use this piece of information" in his report writing on Hunter. (Dkt. 23, ERD Tr. 442:11-443:4.)

44

128. Sgt. Guyton always gave Hunter the benefit of the full PIP period, whether that be 3 or 6 months, before making a decision as to whether or not the program should continue. (Dkt. 23, ERD Tr. 485:4-486:5.)

129. For example, Sgt. Guyton wanted to give Hunter until the end of his first PIP period, on February 1, 2018, to judge Hunter's performance during that PIP period, rather than pre-judging Hunter, but unbeknownst to Guyton, on January 16, 2018, Carnahan emailed HR informing HR that Hunter's PIP ending on February 1st would likely be Hunter's second unsatisfactory in a row – despite that Guyton had not made that determination yet. (Dkt. 23, ERD Tr. 487:13-488:13.)

130. Similarly, an employee who is placed on a Final PIP is generally given the full benefit of the FPIP time period – for example, a full six months in Hunter's case - to become successful with coaching from their first-line supervisor. (Dkt. 25, ERD Tr. 923:14-924:2.)

131. Sgt. Guyton did not pre-judge whether Hunter should be terminated prior to the Final PIP ending on August 28, 2018; however, someone other than Guyton instructed Employee Relations Specialist Winkler on July 31, 2018, to make Hunter's Administrative Review a "top priority." (Dkt. 23, ERD Tr. 489:6-11, 488:19-489:5; Dkt. 25, ERD Tr. 923:8-13, 925:2-14.)

132. As early as August 2, 2018, Carnahan and HR, unbeknownst to Guyton, were already drafting the Administrative Review Summary, meaning the

termination was foreordained, as there is no reason to assemble an

Administrative Review Committee if the employee successfully completes an

FPIP. (Dkt. 23, Tr. 489:12-19; Dkt. 25, 922:2-15.)

**Additional Pretext**

133. Carnahan *falsely* testified at that Arbitration hearing that one of Hunter's performance problems was that the District Attorney had sent emails to Carnahan personally, complaining that Hunter was not getting reports, citations, and evidence submitted in a timely manner. (Farrell Dec., Ex D, No. 15; Dkt. 22, ERD Tr. 158:6-160:17.)

134. Sgt. Guyton and Captain Carnahan knew, in 2014, that Hunter had named them as the supervisors who he felt were discriminating against him. (Farrell Dec., Ex. C, No. 6-7; *see also* Dkt. 24, ERD Tr. 571:15-21; Dkt. 22, ERD Tr. 74:3-76:20, 79:6-15; Dkt. 22, ERD Tr. 71:11-72:10, 72:17-73:3; 75:3-14.)

135. *Following Hunter's termination in 2018:* Sgt. Guyton represented twice under oath that it was "possible" that Hunter filed an ERD complaint in 2014, but he was not aware at the time, and was "not really sure what you're talking about to be honest with you," before admitting that he knew of Hunter's discrimination complaint after being interviewed by Maya Rudd about it on November 11, 2014 and June 16, 2015. (Dkt. 23, ERD Tr. 534:22-537:12, *citing to* Dkt. 22, Arbitration Tr. page 133, line 2, and page 178, line 16; Tr. 538:21-539:2.)

136.  *Following Hunter's termination in 2018:* Defendant itself, by and through its attorney, argued before the Arbitrator that Carnahan and Guyton were unaware of Hunter's ERD activity and therefore could not possibly have been acting in retaliation for the same, which Defendant does not contend it had any good faith basis to make.  (Dkt. 23, ERD Tr. 538:1-20: "Appellant argues that Mr. Hunter's placement on his Final Performance Improvement Plan and his ultimate termination were a result of retaliation for a discrimination complaint that was filed.  This is unfounded. The Sergeant and other management testified credibly that they had no knowledge of this discrimination complaint and one cannot retaliate against someone when they have no knowledge of the complaint.")  (Farrell Dec., Ex. A, No. 3.)

137.  Carnahan also testified *falsely* at the arbitration hearing to the effect that Hunter had never informed management that the numbers they were generating for Hunter's enforcement during the FPIP meeting seemed to be incorrect.  (Dkt. 22, ERD Tr. 185:8-187:8.)

138.  On August 17, 2017, Hunter's supervisors discussed via email that Hunter was reporting he had more enforcement numbers than management seemed to be reporting in the PIP meetings.  (Dkt. 24, ERD Tr. 809:11-810:13.)

47

139. In June of 2018, Hunter reported that management was claiming he had four speed enforcements during the FPIP meeting, but he believed he had double that. (Tr. 870:8-25; Ex. 106-107.)

140. Lt. Rembert followed up and learned Hunter had almost three times the enforcement numbers that had been reported in the management meeting, but he cannot recall doing anything with that information. (Dkt.25, ERD Tr. 871:1-873:7.)

**Handling of Hunter's Complaints that the PIP was Retaliatory and Discriminatory**

141. Sgt. Guyton remembers that Hunter would say to him, in a calm and respectful manner, throughout the PIP, things to the effect of – we all know what this is, we will just go through the motions, and we all know this is ending in me getting terminated because every time I get more numbers, it's just never enough. (Dkt. 23, ERD Tr. 508:25-509:2, 656:23-5.)

142. Hunter documented that he felt retaliation and discrimination were the barriors to him meeting his PIP goals at least three times over the summer of 2018, on his PIP monthly performance reviews. (Farrell Dec., Ex. C, No. 24.)

143. Lt. Rembert testified:

Q. So is it that Hunter was alleging retaliatory and discriminatory actions by command staff, and then you decided, well, he's lying, so I'm not going to send it to HR or any proper channels to be investigated?

A. That would be correct because– I was personally there. I didn't see any of that.

Q. And is that your understanding of what the Department of Transportation normal business procedure is, if an employee claims that they're fearing

retaliation and discrimination, the supervisor can just say, "Huh, I don't believe it" and not pass it up for review?

A. No, no, that's not normal practice.

(Farrell Dec., Ex., C, No. 26; Dkt. 25, ERD Tr. 879:3-16.)

144. Defendant's Employee Relations Specialist, Ms. Winkler, testified under oath that in response to Hunter's complaints of discrimination and retaliation during the FPIP process, the employer "looked into it, and [Hunter] never made a case as to why it was discriminatory. But from all things that I saw, nothing was discrimination from what we were doing," but Defendant has no facts from which to contend that it ever "looked into" Hunter's complaints. (Farrell Dec., Ex. D, No. 13.)

145. The fact is, no one obtained a statement from Hunter. (Dkt 25, ERD Tr. 909:13-23.)

146. Employee Relations Specialist, Ms. Winkler, testified:

Q. I want you to try to listen very carefully to my question and answer the question that I'm asking. Did you look into Hunter's written allegation that his command staff was retaliating against him; yes or no?

A. Yes.

…

Q. Are you testifying that you believe you asked [the command staff involved] what could a potential basis for retatialion be?

A. Correct.

Q. And neither of them told you, well, there was a discrimination complaint that Hunter lodged against us and we were all interviewed in 2015 about that?

A. I don't recall that coming up.

Q. Is that something you would expect them to disclose to you if you asked them in your formal capacity?

A. Yeah.

Q. Yes?

A. Yeah.

Q. **So when you asked command staff that was involved with the FPIP what could possibly he be talking about that we're retaliating against him for, when they said, "we can't think of anything," did that sort of end your investigation there?**

A. **Yea, pretty much. I mean, there was nothing else I could go off of.**

…

Q. So did you alert AAEEO and/or Brenda Brewer that, "Hey, one of…the troopers in the Division of State Patrol is making an allegation of retaliation"?

A. Normally I would, but I don't know if I did in this case. I don't remember. I'm not saying I didn't. I just don't recall.

(Dkt. 25, ERD Tr. 907:21-909:13, 910:12-911:6.)

Dated this Wednesday, April 15, 2026.

Respectfully submitted,

Tavaris Hunter,

Plaintiff,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
ANDREA J. FARRELL
State Bar Number 1064773
1025 Quinn Dr., Suite 500
Waunakee, WI 53597-2502
Phone          608/283-6001
Fax            608/283-0945
Email:         jsolson@scofflaw.com
               ajf@scofflaw.com

/s/ Andrea J. Farrell

_____

Andrea J. Farrell
ATTORNEY FOR PLAINTIFFS

51